[No. 30541. Department Two. July 15, 1948.]

E. J. KESSINGER et al., Respondents, v. HERBERT J. ANDERSON et al., Appellants.[1]

[1]Reported in 196 P. (2d) 289.

158

*Cannon, McKevitt & Fraser* and *Frank J. Blade*, for appellants.

*A. O. Colburn*, for respondents.

STEINERT, J.—Plaintiffs brought suit against defendants to recover damages for alleged breach of warranty against encumbrances. The action was founded upon the covenants of a statutory warranty deed in which defendants had conveyed certain real property to plaintiffs. Defendants in their answer denied the material allegations of the complaint and, by way of affirmative defense, alleged that, at all times prior to the consummation of the transaction between the parties, plaintiffs had full knowledge of the existence of the alleged encumbrance and were therefore estopped from asserting any claim based thereon. In a trial amendment, defendants further pleaded that the failure to exclude the alleged encumbrance from their covenant of warranty in the deed was the result of a mutual mistake on

the part of defendants and plaintiffs. The answer as thus amended prayed that the complaint be dismissed and that the deed be reformed to accord with the original intention of the parties. Plaintiffs' reply put in issue the affirmative allegations of the answer and also, by mutual understanding, the amendment thereto.

The cause was tried to the court without a jury. The court made findings of fact and conclusions of law, upon which it entered judgment in favor of plaintiffs for damages in the sum of $1,635. Defendants appealed.

In November, 1939, A. C. Stebbins and Bessie K. Stebbins, his wife, who will hereinafter be referred to simply as Stebbins, were the owners of two certain contiguous tracts of land, one of which is the land involved in this action and is described as follows:

"The east two hundred forty (240) feet of that part of the southwest quarter (SW¼) of the southeast quarter (SE¼) of Section Thirteen (13), Township Twenty-five (25) North, Range Forty-three (43) East of the Willamette Meridian, in the County of Spokane and State of Washington, lying south of the right of way of the Oregon-Washington Railroad and Navigation Company, EXCEPTING therefrom that part lying south of a line drawn parallel to and fifty (50) feet distant north of the center line of State Road No. 2 as now surveyed."

The other tract was of the same size as the one above described and adjoined it immediately on the west.

At that same time, Vivian R. Nims and Helen B. Nims, husband and wife, who will hereinafter be referred to simply as Nims, were the owners of a tract of land having an area equal to the combined area of the two Stebbins tracts and lying immediately west thereof.

On November 30, 1939, an "indenture and agreement" was entered into by and between Stebbins, named therein as first parties, Lumbermen's Finance Company, a corporation, named as second party, and Nims, named as third parties, wherein it was recited that it was the desire and mutual agreement of all the parties to construct, operate, and maintain a system of water supply and distribution

for the° use and benefit of the owners of the several properties above described.

By the terms of that agreement, first parties, Stebbins, obligated themselves to construct upon their land, being the land here particularly involved, a sanitary water well; to install, maintain, and operate a pumping system of sufficient capacity to supply water to each of the several described tracts; and to construct and maintain a pipe line from the pump, across their land to the east line of the Nims land.

The agreement then recited that each user of the water should install a proper water meter, and thereafter the cost of maintaining the water supply system should be borne and paid by the users in proportion to the respective amounts of water used by them.

The following two paragraphs of that agreement constitute the alleged encumbrance out of which the present action ultimately arose:

"The said First Parties, A. C. Stebbins and Bessie K. Stebbins, husband and wife, and the said Second Party, Lumbermen's Finance Company, a corporation, for and in consideration of the premises and covenants above described and received, *hereby grant and convey* unto said third parties, Vivian R. Nims and Helen B. Nims, husband and wife, their heirs and assigns forever, *an undivided one-half (½) interest in and to the water well to be constructed as above provided,* including the pump, pumps, motors, pipe lines and all equipment and machinery to be supplied and used in connection with the operation of said water well and water supply system *and a perpetual easement in and across the land of first parties* first above described for the purpose of constructing, reconstructing, repairing and maintaining the water supply system and pipe line in the location herein above described, to have and *to hold the same unto said Third Parties, their heirs and assigns forever as an appurtenance to the real property owned by Third Parties* last above described, and,

"The said First Parties, A. C. Stebbins and Bessie K. Stebbins, husband and wife, for and in consideration of the same premises and covenants above described, *do hereby grant and convey* unto said third parties, Vivian R. Nims and Helen B. Nims, husband and wife, their heirs and as-

signs forever, *a perpetual easement in and across a strip of land* running parallel to and approximately thirty-one (31) feet south of the north line of the tract of land second above described [being one of the two tracts owned by Stebbins] for the purpose of constructing, reconstructing, repairing and maintaining a water pipe line running *from the water well, herein before described, to the real property of Third Parties*, last above described, to have and to hold the said easement to the said third parties, *their heirs and assigns forever, as an appurtenance to the said real property of third parties.*" (Italics ours.)

This indenture was signed and acknowledged by all of the parties thereto and was filed for record in the county auditor's office on January 3, 1940.

Sometime prior to January 7, 1946, William Adamis and Anna E. Adamis, his wife, who will hereinafter be referred to simply as Adamis, became the owners of the Stebbins tract first above described, which is the land involved in the present controversy.

On the date last mentioned, Adamis entered into a real-estate contract with the appellants herein, Herbert J. Anderson and Inez E. Anderson, husband and wife, wherein Adamis agreed to sell and convey, and the appellants agreed to purchase, this tract of land (which was then being used as an auto court and known as King Arthur Court), together with the furniture, furnishings, and equipment thereon, for the sum of $42,500, of which $12,500 was simultaneously acknowledged to have been paid in cash and the balance thereof was to be paid in monthly installments of $300 or more. The contract, together with a statutory warranty deed and other documents, was placed with Fidelity Savings & Loan Association in escrow No. 8228.

That contract contained a provision which read, in part, as follows:

"The vendors [Adamis] agree to furnish Title report certified to the date hereof, showing title in vendors free from incumbrance, except apparent liens of easement and a balance due on a Mortgage of the Vendors to Seattle 1st National Bank, which vendors shall discharge in regular course; it being understood, however, that for

the purpose of this instrument, the following shall not be considered as incumbrances: . . . *easements for* telephone, sewer, gas, *water* or electric *service; contracts common to the tract in which the property is situate with reference to supplying water* and electricity *to the premises.* . . ." (Italics ours.)

On May 22, 1946, respondents, E. J. Kessinger and Florence M. Kessinger, husband and wife, signed an agreement with one W. E. Savage, a real-estate broker acting as agent for appellants, whereby respondents were to purchase the tract here involved for the sum of $46,500, of which $2,000 earnest money was then and there paid, $23,000 was to be paid at the time of closing the transaction, and the balance was to be paid "as Purchaser [respondents] sees fit on mortgage and the amounts to Adamis contract." This agreement was upon a printed form adopted by the Spokane Realty Board.

Among other provisions of the agreement between respondents and the broker then acting for appellants were the following:

"Seller [appellants] shall furnish to purchaser [respondents], as soon as reasonably possible, an abstract of title or policy of title insurance certified to date hereof, showing title such as any actually operating title insurance company will insure, and purchaser shall be allowed 1 days for examination thereof and completion of his part of this agreement. A good and sufficient deed executed by seller, title papers now held by seller, and insurance policy in not less than the unpaid balance of the purchase price, with loss payable to seller as his interests may appear, with premiums thereon to be paid by purchaser, shall be deposited in escrow in [with] W. E. Savage [the real-estate broker], Spokane, Washington, to be delivered to purchaser upon full payment of the purchase price.

". . . if the seller cannot show title as agreed above, all money is to be returned on demand and surrender of abstract or title policy to seller, *and this agreement shall be at an end unless the seller elects to perfect such title within a reasonable time.*

"For the purpose of this instrument the following shall not be considered as encumbrances on the above property: . . . *easements for* . . . *water,* or electric *service;*

*contracts common to the tract in which the property is situate with reference to supplying water* and electricity to *the premises.* . . .

"The parties hereto acknowledge that this transaction is entered upon by them in full reliance upon their own independent investigations and not upon any statements, representations, or agreements made by the other party, or by the broker herein or any salesman of such broker, and it is agreed by both parties that no statements, representations, or agreements made by either party, or said broker, or salesman of said broker, shall be binding or constitute any obligation upon either of the parties hereto or said broker, unless the same are reduced to writing and made a part of this agreement." (Italics ours.)

Appellants approved and accepted this sale agreement, subscribed their names as sellers therein, and obligated themselves to carry out all the terms thereof.

Pursuant to that agreement, made through Savage, the broker, appellants and respondents shortly thereafter executed, as between themselves directly, a real-estate contract, prepared by a Spokane attorney, wherein appellants agreed to sell and respondents agreed to purchase the property here involved, on the terms as previously agreed, and at, or about, the same time appellants executed the required statutory warranty deed on which this action is based. These two instruments were first placed with Mr. Savage, as escrow agent, pending full performance of the terms of the contract by the respondents, and ultimately came into the Fidelity Savings & Loan Association escrow No. 8228, referred to above. About that same time, the rights of the Andersons under their contract with Adams were assigned to respondents, and the instrument of assignment was also placed in escrow No. 8228.

The real-estate contract, which was executed directly between the parties, contained, among other printed provisions, the following:

"The vendors [Andersons] agree to furnish [abstract or policy of title insurance] certified to the date hereof, showing title in vendors free from incumbrance, except . . . ; it being understood, however, that for the purpose of this instrument, *the following shall not be considered as in-*

*cumbrances:* . . . ; *easements for* telephone, sewer, gas,. *water* or electric *service; contracts common to the tract in which the property is situate with reference to supplying water* and electricity *to the premises.* . . ." (Italics ours.) ,

The statutory warranty deed, which was placed in escrow No. 8228 with this contract, did not, however, contain the exclusionary clause just quoted, but was a straight warranty deed, "subject to an unpaid balance" of $29,117.68 owing on the contract between Adamis and the appellants.

· On or about July 8, 1946, a title report covering the property here involved, being the property described in the above-mentioned deed, was issued by a title insurance company in Spokane. The report listed as an encumbrance upon the property the following:

"Easement and agreement for pipe line as provided by agreement entered into November 30, 1939, between A. C. Stebbins and Bessie K. Stebbins, husband and wife, as first parties, The Lumberman's Finance Company, a ·corporation, as second party, and Vivian R. Nims and Helen B. Nims, husband and wife, as third parties, recorded in Book 483 of Deeds, page 401, a copy of which will be attached to the policy."

In August, 1946, policy of title insurance was issued, with a copy of the Stebbins-Nims agreement attached thereto. The preliminary report and the policy were in turn delivered to respondent E. J. Kessinger for examination.

As will hereinafter more specifically appear, the contention of the respondents has been, and now is, that they never knew that there was any encumbrance in the form of an easement against the property until they were shown the title report and title policy. Mr. Kessinger testified that when he learned of the existence of the easement, as shown by the title report and policy of title insurance, he at once complained to Mr. Savage, the real-estate broker, who promised to have the matter remedied. We quote from his testimony:

"By Mr. Colburn: Q. Now, Mr. Kessinger, when you saw the title policy with that provision in it, what did you do ·about it? ., . ., . Just tell us what you did about it.

A. When I saw the easement in the title policy, I took it back to Mr. Savage and told him that I didn't want a paper with that easement on there. . . . Q. Go ahead, Mr. Kessinger. A. I took the title policy to Mr. Savage and told him that I didn't want the property with that easement on there, the way it was recorded in 1939, and he said he would try to fix it up. Q. What next happened in that connection? A. He took the policy to his attorney, Mr. Cornelius, the attorney that made out the paper, and he came back and told me that the attorney said he could fix that all up. Q. And then what happened after that? A. He said it would take about a week. Well, before the week was up, Mr. Savage had passed away. Q. Was anything done about it after that? A. I went to the state attorney and also went to Mr. Cornelius. Well, Mr. Cornelius had a typewritten sheet with the title policy showing it would clear it when he got it signed; but he never did get it signed. THE COURT: I don't understand that last answer, Mr. Colburn. I don't know what he is talking about. MR. COLBURN: Well, he said that Savage died before anything was actually done about it. THE WITNESS: That is right. Q. (By Mr. Colburn). Then you came over to the Prosecuting Attorney? A. No. I went to Mr. Cornelius, Mr. Savage's attorney. The attorney he was having to fix the title insurance—straighten it out and clear it up. Q. You mean to clear up the easement that you are talking about? A. To clear up the easement; that is right. Q. And Mr. Cornelius showed you some paper that if and when signed, he said would clear it? A. Would clear it. THE COURT: Oh, I see. Q. (By Mr. Colburn) But so far as you know he never got it signed? A. He never got it signed, no. Q. Was the matter ever cleared up up to the present time? A. The matter never was."

In the meantime, during the month of August, 1946, respondents, without further objection to the state of the title, paid to Savage, the escrow agent, the balance of the amount owing to appellants on the contract, and Savage, in turn, as agent for respondents, paid to appellants the amount then owing to them from respondents.

With matters in this condition, respondents, in October, 1946, entered into negotiations with one Rice, to whom they were trying to sell the property for the sum of $57,000. Rice insisted that the title would have to be cleared of the easement referred to above. Without in any way consulting

appellants or making any demand upon them, respondents proceeded to obtain and pay for releases and quitclaim deeds from the adjoining landowners, successors in interest to Nims. For these documents they expended the sum of $1,635, the amount sought to be recovered in this action. After obtaining such clearance, respondents, in January, 1947, paid the balance owing on the Adamis contract, drew down the papers which were being held in escrow No. 8228, and recorded the warranty deed which appellants had previously executed in favor of respondents. Thereafter, in February, 1947, respondents consummated the sale of the property to Rice.

Upon the trial of the case, the principal factual issue was whether or not respondents were aware of the encumbrance at the time they entered into the agreement for the purchase of the property.

. Despite the provision in that agreement, quoted above, to the effect that neither party was relying upon any statements, representations, or agreements made by the other party unless they were reduced to writing and incorporated in the written agreement, respondent E. J. Kessinger testified at length, and without objection thereto, as to the representations and statements made by appellant Herbert J. Anderson during their negotiations. He testified:

"There was nothing mentioned [by Anderson] about any easement or anything. When I asked him about the water supply, he told me, 'I have my own well, and I sell this water to neighbors at a certain price, a monthly rate,' which was the same as the Dishman rate . . . Q. And that pumping water supply was—Was that any consideration in your being interested in the place? A. That was a consideration. It was part of the property. The well was on the property. That was a part of the deal. . . . At no time did he ever say that anybody had an interest in it or anybody had an interest in it. . . . That is the first time that I had ever saw anything or ever heard of any agreement like that. I didn't know — I had no idea that there was anything against the property until I had seen the report, and still I didn't know there what it was until the title policy came out."

On cross-examination, he further testified:

"Q. And then you were advised that there were pipes leading from that well and furnishing water to the property owners on the west of that King Arthur Court, weren't you? A. I was not advised of anything like that. I was advised that he owned the well and he furnished water for the neighbors — sold the neighbors water. That is all the talk there was about the well. Q. Well, what was your understanding as to how the water got through to the neighbors' property? A. I naturally assumed that there were pipes in there under the ground; but there was nothing said about pipes. Q. But Mr. Anderson did advise you that he was required from that well to furnish water to people west of that tract, didn't he? A. No. Q. You are sure of that? A. Absolutely. He told me that I sold water to the neighbors. He didn't say that he was required to furnish any water. He said he owned the well and he sold water to the neighbors. That was the way Mr. Anderson told me."

Mr. Anderson, on the other hand, testified just as positively that during his negotiations with Mr. Kessinger, on or prior to May 21, 1946, he took Kessinger over the premises, and to the pumphouse, showed him where the pipes went west across and underneath the adjoining lots, and explained to Kessinger fully that he was required to furnish water to those places, but could charge for that service; and that he further explained to Kessinger the circumstances under which the adjoining owners had the right to use the water on a rental basis.

We have taken pains to state at some length the substance of the evidence produced before the court. We now come to the legal questions involved.

Appellants' first contention is that the evidence establishes that it was understood and agreed by and between themselves and the respondents that easements for water and also contracts common to the tract in which the property is situated, with reference to supplying water, were not to be considered as encumbrances on the land; that the failure to exclude such easements and contracts from appellants' warranty deed was the result of a mutual mistake on the part of all the parties to the transaction; and that under such circumstances a court of equity should and will

reform the deed so as to clearly provide what the parties had originally agreed it should provide.

█ The rule of law applicable to appellants' contention is, as conceded by them, that in order to justify the granting of relief on the ground of mistake, the parties to the transaction must have been mutually mistaken, and the evidence of such mutual mistake must be clear, cogent, and convincing. *Peterson v. Paulson*, 24 Wn. (2d) 166, 163 P. (2d) 830; *Kaufmann v. Woodard*, 24 Wn. (2d) 264, 163 P. (2d) 606; 19 Am. Jur. 77, 80, Equity, §§ 57, 61; 53 C. J. 941, 1030, Reformation of Instruments, §§ 59, 199.

█ As indicated above, the evidence upon the question of whether respondents had prior knowledge of the existence of the alleged encumbrance was in sharp conflict. The trial court found in favor of the respondents upon that issue. While, in our opinion, the preponderance of the evidence supported appellants' contention in that respect, we are not in position to say, from a reading of the cold record, that appellants established the fact of a mutual mistake by evidence that is clear, cogent, and convincing. We therefore cannot grant reformation of the deed on the ground of mutual mistake.

Appellants next contend that respondents are, by reason of their acts and conduct, estopped to assert their alleged claim for damages against appellants for breach of covenant of warranty, arising out of the encumbrance created by the recorded agreement between Stebbins and Nims, dated November 30, 1939.

The question presented by this contention is whether, under the facts of the case, the respondents have either impliedly waived any right which they might have otherwise had, or else are now estopped to assert such right.

█ As stated in *Reynolds v. Travelers Ins. Co.*, 176 Wash. 36, 28 P. (2d) 310,

"An implied waiver may arise where one party has pursued such a course of conduct as to evidence an intention to waive a right, or where his conduct is inconsistent with any other intention than to waive it. An estoppel is a preclusion by act or conduct from asserting a right which

might otherwise have existed, to the detriment and prejudice of another who, in reliance on such act or conduct, has acted upon it. A waiver is unilateral and arises by the intentional relinquishment of a right, or by a neglect to insist upon it, while an estoppel presupposes some conduct or dealing with another by which the other is induced to act, or to forbear to act."

In the broad sense of the term, "estoppel" is a bar which precludes a person from denying or asserting anything to the contrary of that which has been established as the truth, whether by matter of record, by matter in writing, or by matter *in pais.* 19 Am. Jur. 600, 601, Estoppel, §§ 2, 3; 31 C. J. S. 191, Estoppel, § 1.

■ The doctrine of equitable estoppel, or estoppel *in pais,* rests upon the principle that, where a person wrongfully or negligently by his acts or representations causes another who has a right to rely upon such acts or representations to change his condition, to his detriment or prejudice, the person performing such acts or making such representations is precluded from pleading the falsity of his acts or representations for his own advantage, or from asserting a right which he otherwise might have had. *Bennett v. Grays Harbor County,* 15 Wn. (2d) 331, 130 P. (2d) 1041, and cases therein cited; accord: *Krings v. Bremerton,* 22 Wn. (2d) 220, 155 P. (2d) 493.

In *Strand v. State,* 16 Wn. (2d) 107, 132 P. (2d) 1011, and again in *Carter v. Curlew Creamery Co.,* 16 Wn. (2d) 476, 134 P. (2d) 66, the following statement from 21 C. J. 1113, Estoppel, § 116, was quoted with approval:

"Estoppel by misrepresentation, or equitable estoppel, is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy. This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces an-

other to believe certain facts to exist and such other right-fully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. It consists in holding for truth a representation acted upon, when the person who made it, or his privies, seek to deny its truth, and to deprive the party who has acted upon it of the benefit obtained. When a party unjustly contrives to put another in a dilemma and to subject him to necessity and distress and he acts one way, it is not for the wrongdoer to insist that he should have acted another way."

To the same effect, see 31 C. J. S. 236, Estoppel, § 59.

■ To constitute estoppel *in pais,* three things must occur: (1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

■ Now, whether we test respondents' acts and conduct by the rule of implied waiver or by that of equitable estoppel, we are convinced beyond any question that respondents are precluded from asserting any claim for damages against appellants arising out of the existence of the encumbrance described above.

For the sake of argument, we may assume that respondents did not know of the alleged encumbrance at the time they negotiated for the purchase of the property and, moreover, were unaware of the fact that the two agreements of purchase which they signed actually contained provisions excepting as encumbrances easements for water service and contracts common to the tract with reference to supplying water. Nevertheless, the fact of the existence of the encumbrance was specifically brought to respondents' attention by the title report and by the title policy before the transaction was fully and finally closed. As shown above, when that fact was thus brought to their attention, Mr. Kessinger, who was handling the matter for the respondents, declared that he did not want the property with that encumbrance on it; as further shown, he insisted that

the real-estate broker have the title cleared, but this was never accomplished. By the very terms of the initial agreement between appellants and respondents, if appellants, the sellers, could not show title as agreed, all money was to be returned to the respondents and the agreement was to be at an end *unless the seller elected to perfect the title within a reasonable time.*

At no time did respondents call the matter of the encumbrance to the personal attention of the appellants. They made no demand of the appellants for the return of the money paid on the contract, nor did they give appellants the opportunity of electing whether they would clear the title or terminate the agreement. On the contrary, respondents in silence drew down the deed from escrow, and permitted appellants to be paid the consideration money, likewise in escrow, in the belief that respondents had accepted title to the property in accordance with the original agreement.

While matters were proceeding along this course, respondents entered upon negotiations to sell the property to a third party, incidentally resulting in a profit of approximately ten thousand dollars to themselves. In order to consummate that sale, respondents, without consulting appellants, undertook to have the title cleared by securing certain releases and quitclaim deeds, for which they expended the sum of $1,635, the amount they now seek to recover in this action. In other words, respondents did not give appellants the opportunity or option to elect whether they would perfect the title or else refund the purchase price, as they had the right to elect under their agreement. Then, after respondents had sold the property, at a profit to themselves, they for the first time, and by this action, made claim of breach of warranty and demand for reimbursement for damages alleged to have been sustained thereby.

We may summarize the situation briefly as follows: Fully cognizant of the alleged encumbrance, respondents permitted the money in escrow to be paid over to the appellants, accepted in turn the deed which also was in escrow, took possession of the property, treated it as their own, and

subsequently sold it at a substantial profit, all without calling upon appellants to remedy the alleged defect, and without giving the appellants the opportunity of making the election reserved to them under their agreement. By such acts and course of conduct, respondents waived any objections to the title and precluded themselves from thereafter setting up such objections as a ground of action against their vendors for breach of covenant of warranty or as a defense to an action by the vendors for the full purchase price of the property. 55 Am. Jur. 728-730, Vendor and Purchaser, §§ 287-290; 66 C. J. 943, 944, Vendor and Purchaser, §§ 645, 646; accord: *Central Life Assurance Society v. Impelmans,* 13 Wn. (2d) 632, 126 P. (2d) 757.

The judgment is reversed, with direction to the trial court to enter judgment to the effect that respondents take nothing by their action.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.

September 20, 1948. Petition for rehearing denied.