[No. 38040. Department One. June 30, 1966.]

HAROLD Z. HEASLEY, *Respondent,* v. RIBLET TRAMWAY COMPANY, *Appellant.*\*

\*Reported in 416 P.2d 331.

*Sharpe, Twigg, Bennett & Deglow,* by *Riner E. Deglow,* for appellant.

*Paine, Lowe, Coffin, Herman & O'Kelly,* by *Walter R. Rodgers, III,* for respondent.

LANGENBACH, J.†—This is an action to recover straight time wages for overtime work. From a judgment for plaintiff, the defendant appealed.

The facts are not seriously in dispute. In the summer of 1959, the appellant initiated work under a contract with His Majesty's Government of Nepal (hereinafter referred to as HMG) to erect a steel-wire ropeway or aerial tramway. This contract was financed through the United States Agency for International Development (hereinafter referred to as AID). It had offices in Katmandu, the capital of Nepal, and in Washington, D. C. The appellant was to install the electrical equipment to operate the ropeway. The operation extended from Hitaura, at an elevation of 1,550 feet, up to a summit of 7,600 feet and down to 4,300 feet to Katmandu, a distance of 26 miles. The terrain was rugged, rough, primitive and without roads to the work site.

In July, 1959, respondent signed a contract with appellant as an electrical supervisor. The contract in part provided that the employee would, within 30 days after any claim arose out of his employment, give written notice thereof to appellant as a condition precedent to bringing suit; that the contract was subject to the contract between HMG and appellant; and that the employee had read both contracts (which respondent admittedly did). The employee's contract did not set forth any specified rate of pay. The HMG-appellant contract, however, provided that the employee (respondent) was to remain for 30 months at an annual wage of $11,200 for a 48-hour work week. It was

---

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

subject to a 25 per cent differential for foreign service. If the employee remained the entire term of his contract, he was to be paid his round trip traveling expenses. Otherwise, he had to pay them. It was permissible for employees to bring their dependents and, if they stayed 18 months, the employees would be paid their round trip traveling expenses.

Since living facilities were not available for employees or dependents, appellant procured a castle in Katmandu, repaired and rebuilt it for their accommodations. Walking to and from work required 6 to 8 hours each way. Normally, the men stayed at the work-site during the work week.

Prior to October, 1959 (after respondent started to work), HMG required the natives to work 60 to 70 hours a week instead of only 48 hours. (Otherwise only 20 hours per week would be spent at actual work.) Consultation was then had between HMG, AID/Katmandu and appellant.[1] Appellant orally agreed that it would compensate for this overtime by giving the employees 1 hour of leave time for each hour of work which was performed in excess of the contractual 48 hour work week (hereinafter referred to as comp. time). AID/Washington was contacted, but to no avail, for an amendment to the contract in consensus with the oral arrangement as in § 4.4.3 provided.

Appellant then met informally with all of its employees and suggested this method of operation to them. All agreed this would give them more time with their families and would permit them to see parts of Asia. They were told that they could accumulate this leave or compensatory time and take it anywhere in the world as long as they returned to Nepal before final termination of work with appellant. They were never told, however, that this was to be the sole method of compensation for overtime. The comp. time was

---

[1] Section 4.4.3 of appellant's contract with Nepal provided: "In the event HMG and ICA [AID] request a substantial change in the scope of work and services hereunder, the parties agree to negotiate in good faith for an equitable adjustment of the aforementioned fee."

payable in United States dollars. At that time, everyone thought that the monsoon season would soon interrupt the work for a considerable time. The rains, however, were never enough to force a stoppage of work. The overtime accumulated to an extent not anticipated.

Respondent made use of the comp. time program; he hunted in Nepal, spent time with his family in Katmandu, and visited Thailand once and India twice. Respondent's wife and daughter came with him. Due to serious sickness in the wife's immediate family, they were obliged to return before the 18-month contract time for returning. Notwithstanding, these expenses were eventually paid by appellant, under AID authorization, after respondent's return to the United States.

As this comp. time began to accumulate for various employees, appellant endeavored to get a written amendment from AID/Washington allowing payment to the employees in United States dollars rather than comp. time. Appellant informed its employees of these efforts. It advised them that AID/Washington would not at that time permit payment for accumulated overtime on a straight cash basis.

In May, 1960, appellant's Nepal manager wrote the Spokane home office:

[E]veryone here has put in longer hours than called for in the Contract and we all know we cannot be reimbursed for that amount and also know we will not be able to take the accumulative time off. *This job cannot be completed on time, by only working 48 hours per week.* The men feel and I concur with them that they are giving their time and effort over and above the 48 hours and are happy to do so, but feel the Company should show some consideration and trust also. (Italics ours.)

On May 24, 1961, appellant's Nepal manager wrote to a Mr. Bailey of AID/Nepal: "I suggest that the most economical way would be to allow them to take this time off in the United States after the completion of the contract."

On June 30, 1961, appellant's vice president wrote to a Mr. Kesseler of ICA (AID)/Washington:

Due to the remote location of the work from the permanent housing facilities, it was decided to work more than

8 hours per day and more than 6 days per week and then compensate the employees for this by giving them time off during the job. This actually has proven to be an excellent method of operation with the exception of the fact that our crew has been so eager to complete the project that the compensatory time off has not been taken.

. . . .

During my visit to Nepal in March of this year, this situation was again discussed with USOM [AID] and our Project Manager as the accrued compensatory time off was adding up to an extent that we feel some other arrangement should be made to take care of it. At that time I instructed our Project Manager to have the U. S. employees take this time when he could possibly spare them, but he has found that he has needed them to prosecute the work.

. . . .

In our opinion the most economical and expeditious manner of equitably solving this problem would be to allow the U. S. employees to take this time off in the United States after the completion of their services in Nepal.

We will greatly appreciate your analyzing the situation and giving us your directive in this regard.

On January 23, 1962, appellant's Nepal manager wrote to a Mr. Van Dyke of AID/Nepal:

Mr. Heasley . . . will have completed his contract on March 7, 1962, and at that time he is returning to the United States on home leave. . . . [I]f the project requires his returning he will do so, but if it is determined that his service is no longer necessary, then he would like to remain in the United States.

[A]s of December 31, 1961, Mr. Heasley has accumulative time in the amount of 165 days, plus thirty days of vacation pay as per the Contract.

Please advise how you want us to handle the wages due [respondent] . . . .

On February 20, 1962, the appellant's president wrote to respondent:

By this time you have also been informed by . . . [the Nepal manager] that there are restrictions on paying the accumulated vacation pay and that unless it is

taken in Nepal it will be paid at the base rate not including overseas differential. . . . [The Nepal manager] has a copy of this letter that you can look at to evaluate the AID/W ruling.

. . . .

As stated previously we seriously doubt that you will be able to realize anything from the compensatory time unless it is taken in this manner.

The appellant's president wrote the Nepal manager on April 9, 1962, ". . . as to whether or not such accrued overtime can be taken after final departure from the job without returning for formal termination, we understand that the answer is negative."

Before respondent returned to the United States in March, 1962, he expressed his willingness to return to Nepal if needed. He was furnished a round trip ticket. After arriving in the United States, respondent reiterated his willingness to return to Nepal. Appellant, however, requested the return ticket, and informed respondent that he would have to use his comp. time in the United States and return to Nepal at his own expense ($1,500) to terminate his employment. Respondent rejected this and terminated his employment.

The mills of the gods grind slowly. It is a sad commentary that about a month after respondent returned to the United States, amendment No. 7 was made to this contract:

Add the following Subsection 4.2.1.7:

4.2.1.7 From and after the effective date of Amendment No. 7 [April 18, 1962] payments under Section 4.2.1.1 may include compensation for overtime at straight time rates when specifically authorized or approved from time to time by the Director, USAID/Nepal as necessary for the successful and economical accomplishment of the work hereunder. To the maximum extent possible overtime shall be compensated for with Compensatory Time Off prior to completion of contract services.

After terminating his employment, respondent instituted this action. From a judgment for respondent, appellant made 15 assignments of error which raised the issues (1) whether certain findings of fact are supported by the evi-

dence or are material; (2) whether the court's failure to adopt appellant's proposed findings of fact and conclusions of law was error; (3) whether certain conclusions of law were in error; (4) whether the trial court properly permitted the respondent to call appellant's Nepal manager as an adverse witness; (5) whether plaintiff introduced evidence sufficient to state a claim; and (6) whether respondent by his conduct waived his rights or estopped himself or ratified the comp. time as the exclusive method of payment.

As to the first issue, appellant's argument was based on immateriality of the findings or the incompleteness of the findings or on the evidence being contrary to the findings. Citing *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 395 P.2d 633 (1964), appellant argued that the findings were inadequate for judicial review; they were general conclusions. The findings of fact and the oral decision were sufficient to show that the trial court had " . . . an understanding of the conflicting contentions and evidence, and a resolution of the material issues of fact that penetrates beneath the generality of ultimate conclusions, together with a knowledge of the standards applicable to the determination of those facts." *Groff v. Department of Labor & Indus., supra,* at 40.

What this court said in *Industrial Electric-Seattle, Inc. v. Bosko*, 67 Wn.2d 783, 791, 410 P.2d 10 (1966), is applicable to the second issue as well as the first:

> The rule of law which this court applies in reviewing assignments of error pertaining to findings of fact is applicable to the refusal to make findings as well as to the making of findings. The rule is that, if the findings made by the trial court are supported by substantial evidence in the record, this court can not and will not substitute its own findings (such as appellants' proposed findings) for those of the trial court, even though this court might have resolved the factual dispute the other way and made different or contrary findings, were it the trier of the facts.

As to the conclusions of law assigned as error, they were based on findings of fact substantiated by the evidence. No error was committed.

 Next, appellant raised the question of whether the trial court properly permitted the respondent to call the appellant's Nepal manager as an adverse witness under RCW 5.04.010. At the time of trial, the manager was no longer in appellant's employment nor an officer. Under RCW 5.04.010, an employee of an adverse party may be called to testify as an adverse witness. *Isaacs v. National Bank of Commerce*, 50 Wn.2d 548, 313 P.2d 684 (1957). Generally, the employee does not lose his status as an adverse witness where his employment terminated prior to trial. See Anno. 56 A.L.R.2d 1008. Although the respondent called the Nepal manager as an adverse witness, he testified as any other witness at the trial. There was no error.

The remaining issues were raised by the trial court's denial of appellant's motions to dismiss the case at end of respondent's case and at the close of the entire case. Both these motions contended that respondent failed to introduce evidence to substantiate his claim, and, alternatively, respondent's waiver or estoppel or ratification.

 Respondent did introduce evidence sufficient to substantiate his claim. Appellant's challenge to the sufficiency of the evidence admitted the truth of respondent's evidence and all inferences which reasonably might be drawn therefrom, and the evidence is to be interpreted most strongly against the appellant and most favorable to respondent. *Music v. United Ins. Co. of America*, 59 Wn.2d 765, 370 P.2d 603 (1962). Respondent signed a 30-month contract to work 48 hours a week as a supervisor. After he started to work, by agreement of appellant and AID/Nepal and HMG, under § 4.4.3, *supra*, this work week was extended to 70 hours a week. AID then provided the comp. time method of compensation for overtime; which appellant presented to its employees, who orally agreed to abide by it.

Under the comp. time program, the uncertainties were whether this comp. time could be paid in dollars after re-

spondent fulfilled his contract and terminated his employment, or whether the comp. time would be the exclusive method of compensation.

Appellant's major contention was that the facts did not substantiate the trial court's finding that it benefited from respondent's overtime work, in that since the appellant was paid a flat rate for doing the job, it received no extra compensation or pecuniary benefit. We think the appellant was benefited by getting the job done ahead of schedule, and by making optimum use of the employees' time in light of the possible monsoon season stoppage of the work and of HMG requiring a 70-hour work week for the natives. The benefit to appellant was not negated by the employees being afforded the opportunity to travel or to spend more time with their families.

The employees' nonacquiescence of the comp. time program would have apparently resulted in either dismissal or a continuance under the formal program. If the supervisors terminated their employment, they would have been obligated to pay their own traveling expenses home. If all supervisors refused to work overtime under the proposed conditions, not only would the supervisors be sitting and doing nothing, but appellant would be without supervisors for as much as 20 hours a week. As the trial court concluded, the arrangement was as a practical matter most convenient for all concerned.

The trial judge properly characterized the issue as whether respondent, by not utilizing the comp. time, "has in effect donated his time to Riblet Tramway Co. [appellant]." The trial judge also pertinently remarked that "unless it is clearly set out and delineated in the contract, it would be a miscarriage of justice to say that a company could make use of or receive a benefit of this man's extra time and not have to pay for it."

█ ▪ " . . . in the absence of circumstances indicating otherwise, it is inferred that a person who requests another to perform services of value for him thereby bargains and by implication agrees to pay for such services." *Hardung v. Green,* 40 Wn.2d 595, 597, 244 P.2d 1163 (1952). Where

there is no reason for a person to request payment, his failure to do so through his rendition of services is not inconsistent with his expectation of payment. *Jacobs v. Brock,* 66 Wn.2d 878, 406 P.2d 17 (1965).

■ Appellant's argument of estoppel, ratification and waiver was without merit. Citing *Kessinger v. Anderson,* 31 Wn.2d 157, 196 P.2d 289 (1948), appellant's argument of estoppel was that respondent, in failing to object to the overtime work unless paid in cash, lulled appellant so that it could not pursue other possible means of operation. The *Kessinger* case requires three elements in establishing estoppel in pais: (1) an act inconsistent with the claim asserted; (2) the other party acts in reliance on the claimant's act; and (3) injury resulting to such other party from the claimant's inconsistent assertion. "Estoppels must be certain to every intent, and are not to be taken as sustained by mere argument or doubtful inference." *Stouffer-Bowman, Inc. v. Webber,* 18 Wn.2d 416, 428, 139 P.2d 717 (1943). See, generally, *Moar v. Beaudry,* 62 Wn.2d 98, 381 P.2d 240 (1963). Not only was respondent's claim for cash consistent with comp. time; as an alternative, appellant was not lulled into a false sense of security to its detriment—it merely cited lost operation techniques unknown to itself or to the court.

Citing *Woodworth v. School Dist. No. 2, Stevens Cy.,* 92 Wash. 456, 159 Pac. 757 (1916), appellant argued that ratification was based on respondent's use of comp. time for his travels without objection until time to terminate his employment. Respondent, however, did not know that this was to be the exclusive method of compensation which must be enjoyed prior to termination of employment. Moreover, the *Woodworth* case was concerned with the principal's ratification of his agent's unauthorized acts.

■ The waiver argument was based on respondent's use of comp. time without objection and that the contract provision, that all claims from employment must be served in writing within 30 days after arising, was violated by respondent in not giving written notice throughout his period of employment. In conjunction, appellant cited the

3-year statute of limitations as being applicable since the oral modification of the contract occurred more than 3 years prior to instituting this action. The statute of limitations on amounts due under a contract for continuous service does not begin to run until the contract is terminated. *Macchia v. Salvino,* 64 Wn.2d 951, 395 P.2d 177 (1964).

To establish waiver, the *Kessinger* case, *supra,* required a person either expressly or impliedly to relinquish a right. "Mere silence does not constitute a waiver unless there is an obligation to speak." *Voelker v. Joseph,* 62 Wn.2d 429, 435, 383 P.2d 301 (1963). ". . . the courts invoke the doctrine of implied waiver by silence or acquiescence only where a forfeiture would otherwise result. There is no question of forfeiture before us here." *Voelker v. Joseph,* at 436.

Respondent's silence was not inconsistent with a claim for money for overtime work after his contract with appellant was fulfilled. His contract had been completed and appellant's contract in Nepal was substantially finished. He then requested compensation, which was denied. Not until then was the possibility of no payment in any form brought to his attention. He did not waive his right to compensation in American dollars. The appellant did not deny that the respondent had worked the hours of time under consideration. It merely denied that he was entitled to payment at this time.

The judgment of the trial court is affirmed.

ROSELLINI, C. J., HILL, OTT, and HALE, JJ., concur.

---

October 28, 1966. Petition for rehearing denied.