[No. 59612-3.   En Banc.   June 24, 1993.]

COLONIAL IMPORTS, INC., *Petitioner*, v. CARLTON NORTHWEST, INC., *Respondent*.

*Williams, Kastner & Gibbs,* by *David C. Kelly* and *Daniel W. Ferm,* for petitioner.

*Gregory C. Sisk* and *David J. Smith,* for respondent.

DURHAM, J. — In this case we are asked to decide who should bear the loss when an independent automobile broker declares bankruptcy after receiving payment from one party for vehicles to be delivered, but without having given payment in full to the other party holding the vehicles. At trial, petitioner, Colonial Imports, Inc. (the first party) succeeded in recovering against the respondent, Carlton Northwest, Inc. (the second party) under theories of negligent misrepresentation and equitable estoppel. The Court of Appeals reversed the trial court on both theories and vacated the judgment. We agree with much of the reasoning of the Court of Appeals, but remand to the trial court for a reconsideration of the estoppel issue utilizing the correct evidentiary standard.

In order to understand this case, a recounting of the facts found by the trial court is necessary. Petitioner, Colonial Imports, Inc., trading as Colonial Honda (Colonial) is a Honda automobile dealer doing business in Virginia. Respondent, Carlton Northwest, Inc., d.b.a. Don Carlton Honda (Don Carlton) is a Honda dealer located in Washington state. J.D.

Chaffin and Associates, Inc., d.b.a. Imports Unlimited (Imports Unlimited), located in Texas, was a wholesale broker who purchased cars from dealers with excess inventory and sold them to dealers with inadequate inventory.

Beginning in May 1988, Don Carlton sold a number of vehicles to Imports Unlimited in three independent transactions. These transactions all followed the same general pattern: Imports Unlimited would contact Don Carlton regarding any excess inventory. Once a price had been negotiated, Don Carlton would fax the vehicle invoices to Imports Unlimited so that Imports Unlimited could "shop" the vehicles. Don Carlton would retain possession of the vehicles until such a time as delivery to the ultimate buyer had been arranged by Imports Unlimited.

When Imports Unlimited had found a buyer, it would request that Don Carlton endorse the original manufacturer's certificates of origin (MSOs) for the vehicles over to Imports Unlimited in order for Imports Unlimited to obtain financing. Imports Unlimited refused to allow the notation of any security interest on the MSOs, but agreed to send a $5,000 down payment for the MSOs. In each transaction, Don Carlton sent the MSOs without restrictions. After sending the MSOs, Don Carlton expected full payment of the remainder due within 3 to 5 business days, but Imports Unlimited was consistently late with its payments.

MSOs are documents issued by manufacturers to evidence a transfer of ownership for each vehicle which is sold to a retail dealer. MSOs are also used to document a transfer of ownership from one dealer to another. An MSO is usually the only document used in the automobile business which documents ownership of a vehicle prior to such vehicle's first retail sale. The MSO provides that:

> For value received, I the undersigned, transfer the vehicle described on the face of this certificate to [name and address of purchaser inserted] . . . and warrant title to the vehicle.

Clerk's Papers (CP), at 508. Generally, a dealer does not release an MSO until the dealer is paid in full for a vehicle. Dealers consider an MSO to be evidence of ownership of the

vehicle described in the MSO. Bills of lading, or other documents used as a substitute for the actual goods, are not used as a matter of course in the sale of cars from one dealership to another or in the sale of cars from a dealer to a wholesale broker.

The subject of this litigation involves the third transaction between Don Carlton and Imports Unlimited. In July 1988, Imports Unlimited contacted Colonial in Virginia to see if it needed any additional inventory. Colonial responded affirmatively, and Imports Unlimited offered it 20 Hondas it had arranged to purchase from Don Carlton. Larry Matthews, the general manager of Colonial, agreed on condition that Colonial would not transmit the purchase price to Imports Unlimited until Colonial had in its possession the original MSOs showing an unconditional transfer of ownership. Prior to making this decision, Larry Matthews contacted at least one dealer who had purchased cars from Imports Unlimited and was told that its experience with the firm was satisfactory. The 20 MSOs were received by Colonial on July 21, 1988.

After receiving the MSOs but before transmitting the purchase price, Larry Matthews called Pat Deacon, the general manager of Don Carlton. This was their first contact. Matthews informed Deacon that Colonial was purchasing vehicles from Imports Unlimited, that Colonial had the original MSOs in its possession, that he was aware that the vehicles were coming from Don Carlton and that he knew that Don Carlton still had possession of the vehicles. Matthews inquired "whether everything on the MSOs was as it appeared to be" and Deacon replied "yes". CP, at 515. Deacon did not say anything about conditions or restrictions, nor did he mention the $5,000 deposit. When Matthews questioned sending the purchase price directly to Imports Unlimited, Deacon told him that all the previous deals had been structured this same way. Deacon also stated that Don Carlton had always been paid, without mentioning any of the problems he had experienced in the past.

On July 22, 1988, Colonial transmitted the purchase price of $229,209 to Imports Unlimited, which was supposed to pay Don Carlton from these funds but never did so. Imports Unlimited subsequently filed for bankruptcy and neither party was able to recover the purchase price from Imports Unlimited. The issue then became who should bear this loss.

In the trial court, Colonial asserted a number of claims against Don Carlton. The trial court found for Colonial on its negligent misrepresentation claim, using a preponderance of the evidence standard. This claim was premised on the assurances that Deacon made over the phone to Matthews.

The trial court also found that Don Carlton was equitably estopped from claiming ownership in the 20 automobiles, again using a preponderance of the evidence standard. The estoppel arose from the operative transfer of ownership language on the MSOs, along with Mr. Deacon's failure to note any conditions or restrictions in his conversation with Mr. Matthews. The trial court found Colonial's reliance upon these documents to be reasonable.

The Court of Appeals reversed the trial court on the negligent misrepresentation theory, holding that no duty to disclose could exist absent a fiduciary relationship. The court also found that any reliance by Colonial upon the MSOs was not justifiable. As to the equitable estoppel claim, the appellate court found that the trial court applied the wrong evidentiary standard. The Court of Appeals held that the proper standard is clear, cogent, and convincing evidence.

The two essential issues[1] that must be addressed are: (1) under the facts of this case, can Don Carlton be found to have a duty to disclose such that it may be held liable for

---

[1]Colonial also urges us to consider its theory of comparative innocence as an alternative method of recovery. However, the trial court specifically found that Don Carlton was not an innocent party and that the doctrine was inapplicable. An appellate court will not overturn a trial court's finding of fact if it is supported by substantial evidence in the record. *Heasley v. Riblet Tramway Co.*, 68 Wn.2d 927, 933, 416 P.2d 331 (1966). The trial court's ruling on this matter is more than supported by the evidence, and will not be revisited on appeal.

negligent misrepresentation; and (2) what is the proper standard of proof for a claim of equitable estoppel.

## NEGLIGENT MISREPRESENTATION

■ The Court of Appeals concluded that, absent a fiduciary relationship, there was no duty to disclose that could give rise to a claim of negligent misrepresentation. The existence of a duty is a question of law. *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 168, 759 P.2d 447 (1988). This court explicitly adopted the Restatement (Second) of Torts (1977) (Restatement) as the standard governing claims of negligent misrepresentation in *Haberman v. WPPSS*, 109 Wn.2d 107, 161-62, 744 P.2d 1032, 750 P.2d 254 (1987).

■ Section 551 of the Restatement explains the circumstances under which a duty to disclose will arise:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) *matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading*; . . ..

(Italics ours.) Restatement § 551. Section 551(2)(a) of the Restatement deals specifically with the duty to disclose when a fiduciary relationship exists. On the other hand, section 551(2)(b) creates a duty to disclose which is wholly independent from the fiduciary relationship discussed in section 551(2)(a). *See* Restatement § 551, Comment on Subsection (1). Hence, by the clear terms of the Restatement, a duty to disclose can be found outside of the fiduciary context.

Case law is in accord with the Restatement. Although we have stated that, ordinarily, the duty to disclose exists only

when there is a fiduciary relationship, and not when the parties are dealing at arm's length, *Oates v. Taylor*, 31 Wn.2d 898, 903, 199 P.2d 924 (1948), we have never attempted to limit negligent misrepresentation strictly to the fiduciary context. Indeed, in *Oates* itself, this court explained that a duty may arise even outside of the fiduciary relationship:

> That duty arises where the facts are peculiarly within the knowledge of one person and could not be readily obtained by the other; or where, by the lack of business experience of one of the parties, the other takes advantage of the situation by remaining silent.

*Oates*, at 904. Similarly, *Favors v. Matzke*, 53 Wn. App. 789, 770 P.2d 686, *review denied*, 113 Wn.2d 1033 (1989) discloses some of the other contexts in which the duty to disclose may arise:

> In Washington, the court will find a duty to disclose where the court can conclude there is a quasi-fiduciary relationship, where a special relationship of trust and confidence has been developed between the parties, where one party is relying upon the superior specialized knowledge and experience of the other, where a seller has knowledge of a material fact not easily discoverable by the buyer, and where there exists a statutory duty to disclose.

(Citations omitted.) *Favors*, at 796.

Although the Court of Appeals misspoke when it held that the duty to disclose arises *only* within the context of a fiduciary relationship, its inclination was correct. Some type of special relationship must exist before the duty will arise. *See, e.g., Haberman*, at 166 (privity or fiduciary relationship generally necessary); *Hoffer v. State*, 110 Wn.2d 415, 429, 755 P.2d 781 (1988) (special relationship creates actionable duty), *adhered to on rehearing*, 113 Wn.2d 148, 776 P.2d 963 (1989).

The negligent misrepresentation cause of action outlined by the Restatement incorporates this concept. Section 551(2) assumes that the duty will be invoked as between parties to "a business transaction". Accordingly, the next section generally circumscribes this liability to situations involving the provision of business advice, either by one who publicly proclaims expertise or by one having a financial stake in the

matter under consideration. Restatement § 552. Cases and treatises discussing negligent misrepresentation similarly premise the finding of a duty to disclose upon the nature of the relationship between the parties. *See, e.g., Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 160-65, 843 P.2d 890 (1992) (examining nature of parties' relationship to decide whether to allow negligent misrepresentation claim); *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 501 (S.D. 1990) (emphasizing that plaintiff in misrepresentation case must be a party to the transaction). *See generally* 2 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, *Torts* § 7.6, at 405-06 (2d ed. 1986); W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* 746 (5th ed. 1984).

We conclude that the relationship, such as it was, between the parties to this lawsuit was insufficient to support a duty to disclose. There was no pre-existing special relationship between Colonial and Don Carlton, and Don Carlton was not in the business of giving financial advice. The two principals had never spoken before this brief phone call, and the only arguable link between them was the successive transfer of the MSOs. Both principals are experienced and independent businesspersons. Each party conducted an independent transaction with Imports Unlimited, and neither was in any sense a party to the same business transaction. Imports Unlimited was not acting as the agent of either party. While Don Carlton had experienced delays in payment from Imports Unlimited, it ultimately received payment and knew naught of the precarious financial situation of Imports Unlimited. The relationship between these two parties is simply too tenuous to support liability for negligent misrepresentation. Imposition of a duty to disclose under these circumstances would expand the bounds of negligent misrepresentation beyond its reasonable parameters.[2] We hold that, under the facts of this

---

[2] Were a duty to disclose to be imposed upon Don Carlton, there would be no logical reason why Colonial could not also proceed against the unnamed other dealer who had also vouched for Imports Unlimited, assuming such dealer had experienced any similar problems. *See CP*, at 514. *See also Haberman v. WPPSS*,

case, there could be no duty to disclose. Hence, Colonial's claim of negligent misrepresentation must fail.

## EQUITABLE ESTOPPEL

■ The trial court found for Colonial on its equitable estoppel claim using a preponderance of the evidence standard. The elements of equitable estoppel are: (1) an admission, statement, or act inconsistent with a claim afterward asserted, (2) action by another in reasonable reliance upon that act, statement or admission, and (3) injury which would result to the relying party if the first party were allowed to contradict or repudiate the prior act, statement or admission. *Robinson v. Seattle*, 119 Wn.2d 34, 82, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992). The Court of Appeals reversed, holding that the proper standard for a claim of equitable estoppel is clear, cogent and convincing evidence.

Petitioner argues that the trial court's use of the preponderance of the evidence standard was correct. While recognizing the support in the case law for the more stringent evidentiary standard, the petitioner contends that this standard is restricted to cases where (1) the claim was asserted against the government or (2) it was used in an effort to divest a party of an interest in real property.

■■ Generally, "[e]quitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence." *Robinson*, at 82. *Accord* 28 Am. Jur. 2d *Estoppel and Waiver* §§ 3, 148 (1966). Like all evidentiary standards, this burden of proof contains two elements: first, the amount of evidence that is a prerequisite to submitting the question to the trier of fact; and second, the persuasive impact which the law requires of that evidence. *Cook v. Cook*, 80 Wn.2d 642, 646, 497 P.2d 584 (1972). The first element, often referred to as the "burden of production", need only be met by substantial evidence. *Cook*, at 646. In the case at hand, there is no allegation that the plaintiff has not met its burden of production.

---

109 Wn.2d 107, 162, 744 P.2d 1032, 750 P.2d 254 (1987) (legitimate fears of unlimited liability support narrow scope of action for negligent misrepresentation).

It is the second element, often referred to as the "burden of persuasion", which is at issue here. The ordinary burden of persuasion in civil cases is that the trier of fact must believe that it is more probable than not that the fact in issue is true. *Cook*, at 646. The more stringent standard of "clear, cogent, and convincing evidence", however, requires that the trier of fact be convinced that the fact in issue is "highly probable". *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973); *Cook*, at 647. In other words, "the facts relied upon to establish an equitable estoppel must be clear, positive, and unequivocal in their implication . . .." 28 Am. Jur. 2d *Estoppel and Waiver* § 148, at 831 (1966).

Equitable estoppel has the effect of precluding one party from offering an explanation or defense that he or she would otherwise be able to assert. The law does not encourage enforcing such silence, and so demands from the party asserting an estoppel the highest possible burden of persuasion. "No party ought to be precluded from making out his case according to its truth . . . [h]ence, the doctrine of [equitable estoppel] must be applied strictly, and should not be enforced unless substantiated in every particular." *Stouffer-Bowman, Inc. v. Webber*, 18 Wn.2d 416, 428, 139 P.2d 717 (1943). The burden of "clear, cogent, and convincing evidence" serves to ensure that the party against whom the estoppel is asserted is not unjustly silenced.

Colonial's attempt to limit the "clear, cogent, and convincing evidence" standard to only certain situations is unpersuasive. The two cases Colonial discusses as applying the lower standard are not convincing, as in neither case was the standard of proof actually an issue. *See Pacific Nat'l Bank v. Richmond*, 12 Wn. App. 592, 530 P.2d 718 (involving an appellate court review of a trial court's *denial* of a claim of equitable estoppel), *review denied*, 85 Wn.2d 1011 (1975); *Farm Crop Energy, Inc. v. Old Nat'l Bank*, 38 Wn. App. 50, 685 P.2d 1097 (1984), *rev'd in part on other grounds*, 109 Wn.2d 923, 750 P.2d 231 (1988) (preponderance standard mentioned in dissent, but not at issue in case). Moreover, Colonial's argument ignores the numerous cases in which we

have applied this standard outside of the context of claims against the government or claims involving an interest in real property. *See, e.g.*, *Stouffer-Bowman*, at 428 (discussing similar standard in context of materialmen's lien); *Heasley v. Riblet Tramway Co.*, 68 Wn.2d 927, 936, 416 P.2d 331 (1966) (discussing similar standard in context of wage dispute); *In re Marriage of Sanborn*, 55 Wn. App. 124, 129, 777 P.2d 4 (1989) (discussing same standard in context of maintenance payments). As discussed above, this higher burden of proof serves as a useful limitation to the doctrine of equitable estoppel, and we will continue to require that the estoppel be made out with clear, cogent, and convincing evidence.

In the case at hand, the alleged estoppel was premised upon the unconditioned transfer of the MSOs, documents whose veracity is unimpeachable and whose inference should be clear. The MSOs themselves contain language which, on its face, effects a transfer. The trial court specifically found that, *as between dealers*, these are generally the only documents used to show a transfer of ownership.[3] Don Carlton did not note any security interest upon the MSOs, nor did it attempt to apprise Colonial of its alleged security interest. The trial court made a specific finding of good-faith reliance.[4]

---

[3] Don Carlton has brought to our attention a number of cases which have held that MSOs are not documents of title and do not indicate exclusive possession of the vehicles. *See Transamerica Comm'l Fin. Corp. v. Union Bank & Trust Co.*, 584 So. 2d 1299, 1303 (Ala. 1991); *Draper Bank & Trust Co. v. Lawson*, 675 P.2d 1174, 1178 (Utah 1983); *Key Bank v. Saab-Scania of Am., Inc.*, 549 F. Supp. 96, 98 (M.D. Fla. 1982). However, none of these cases involved the status of MSOs as between car dealers prior to the first retail sale, which is the dispositive issue in deciding whether an estoppel can lie. The MSOs do not need to have the legal status of documents of title in order for them to form the basis for an estoppel. These documents will be adequate if the evidence shows that, in the ordinary course of business between dealers, MSOs are relied upon to evidence a transfer of ownership.

[4] The Court of Appeals' holding that Colonial Honda was not justified in relying on the MSOs as evidence of ownership appears to relate to Colonial Honda's negligent misrepresentation claim, not its estoppel claim. As such, its holding was irrelevant, since the negligent misrepresentation claim was premised on the phone call, not the MSOs themselves. To the extent that this holding was meant

The injury here is manifest, and the facts suggest that Colonial has made out a case for equitable estoppel. However, "[u]nless only one reasonable inference can be drawn from the evidence, estoppel is a question for the triers of the facts, the jury or the trial court." 28 Am. Jur. 2d *Estoppel and Waiver* § 149, at 831-32 (1966). *Accord Litz v. Pierce Cy.*, 44 Wn. App. 674, 683, 723 P.2d 475 (1986). Accordingly, we feel compelled to remand this issue to the trial court for reconsideration of the estoppel issue in light of the proper burden of proof. There should be no need for a rehearing, as the record is already fully developed.

In sum, the Court of Appeals is affirmed as to the negligent misrepresentation claim. The Court of Appeals is also affirmed as to the correct standard of proof for equitable estoppel. However, the case is remanded to the trial court for a review of the facts and a reconsideration of the estoppel issue utilizing the "clear, cogent, and convincing evidence" standard.

ANDERSEN, C.J., and BRACHTENBACH, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

Reconsideration denied August 3, 1993.

---

to relate to the estoppel issue, we reverse the Court of Appeals. Justifiable reliance is properly an issue for the finder of fact. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 233-34, 685 P.2d 1081 (1984).