[No. 30665. Department Two. November 29, 1948.]

JACK T. OATES et al., Respondents, v. W. F. TAYLOR et al., Appellants.[1]

[1]Reported in 199 P. (2d) 924.

*Fred S. Merritt,* for appellants.

*Melvin T. Swanson,* for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment rendered against appellant W. F. Taylor and the marital community composed of Taylor and wife, in the sum of $2,462.81.

W. F. Taylor has been for some time a builder and contractor in Seattle. About February 1, 1946, he started to work as building superintendent for J. F. Huson, Inc., a corporation, which was building a number of houses. About a month later, it developed that Huson, Inc., was bankrupt, having liabilities of $139,000 and assets of $82,000.

Home Finders, Inc., was then organized, with Gwendolyn Babcock as the principal stockholder and secretary of the corporation. The new corporation took over the Huson business, obtained mortgage loans from White & Bollard, Inc., and made additional contracts to build homes.

About August 29, 1946, the financial affairs of the corporation became so involved that Taylor threatened to quit. He held no stock in the corporation. It was then decided that portions of the funds received would be turned over to him. He deposited these funds in the Lake City Bank in the account of Home Finders, Inc., and then disbursed the funds to laborers and materialmen to whom the corporation was indebted.

On January 10, 1947, the corporation entered into a contract to build a home for Mr. Oates. We quote that portion of the agreement which is material to the questions in issue.

"The cost of said residence to be the sum of Nine Thousand Six Hundred Fifty ($9650), and it is specifically understood and agreed that the above figure covers the house complete, including the lot, and that the determining factor as to what is included therein shall be the plans and specifications attached hereto.

"The said purchaser agrees to pay the sum of $500.00 ·as earnest money and $2500.00 when the basement is started. The balance of the purchase price ($6650.00) shall be paid as follows:

"$665.00 upon the basement being poured and completed.
665.00 when the house is framed and roofed.
1330.00 when the house is plastered.
1995.00 when the millwork is in.
1995.00 when the house is completed as per the plans and specification.

"There are no verbal or other agreements which shall affect the validity of this contract, and it is agreed that all terms and conditions shall be performed by both parties exactly as contained in this contract.

"The Builders herein agree to furnish a Title Insurance Policy to the purchasers, insuring a title free and clear of all encumbrances."

The earnest-money payment of $500 was retained by the corporation. When Oates was first asked to pay the $2,500, he refused to do so until the basement was actually started. He testified that the representatives of the corporation came to him on a Saturday and told him that they wanted the $2,500. He went down to the lot, and the basement had not been started. They said that they would be there the next day. Monday they called him and said that they had started the basement. He went down again and no work was started, and he refused to make the payment. They called that afternoon and said the work had been commenced. The next day he found that the bulldozer was there, ready to start, and he gave them the check for $2,500. This payment was made on February 4, 1947, and of that payment $1,000 was retained by the corporation and $1,500 deposited by Taylor

in the corporation account at the Lake City Bank and used to pay laborers and materialmen.

On February 24, 1947, when the basement was completed, $665 was paid and turned over to Taylor. On March 21, 1947, the house was framed and roofed, and another $665, together with an additional $125 for a dormer, was paid and turned over to Taylor.

In the meantime, the financial affairs of the corporation had gotten into a precarious condition. Taylor had taken a voluntary cut of fifty per cent in wages. He wanted to quit in January. He testified:

"I was wanting to build some houses too for myself, . . . . I knew if I left, the people I was buying material from, I'd have to go tell them I was going to leave, because they trusted me to see they was getting paid, and also the men that was on the job; but I wanted to stay there and help these people get their homes so Home Finders would get out of it too."

On April 1st, he went to the office with a list of bills, totaling $2,565.08, which would have to be met by the tenth. He was told to come back later, which he did, on the ninth. Mrs. Babcock then said that the money would have to be drawn from Mr. Oates. At that time, no payment was due under the Oates contract.

At any rate, Lawrence Justice (the salesman who negotiated the original contract with Oates) and Taylor went to see Mr. Oates. Justice did most of the talking. The testimony is in dispute as to what transpired at this meeting. Something was said about needing the money to pay other bills and also to buy a carload of hardwood flooring, to be used partly in the Oates house and partly in other houses being built by the corporation. Oates was told that, if he advanced the money, he would not have to make the next payments when they became due under the contract. He told them that by June 1st he would have to be out of the house that he was then living in, and they promised to cooperate by having his house ready by that time. He then agreed to give them the check the next day. He testified:

"Q. Who talked to you? Who did the talking? A. Well,

first Justice introduced the conversation, and then he kept asking Taylor then to answer me about the house. I was interested in getting the home by June 1st."

The next day, he went to the office with the check for $2,565.08. He asked Forrest Aufforth, a salesman, for Justice. Mr. Aufforth testified that he said: "This is the check that Mr. Justice had asked for to pay some bills."

This check, together with a check for $2,680, drawn from White & Bollard, was turned over to Taylor, who then went out with his Home Finders, Inc., checkbook and paid the laborers and materialmen. He did not receive any of this money himself.

After paying the bills, Taylor left the company. Before he left, he asked Mr. Omtvedt, who succeeded him as superintendent, to rush the completion of the Oates house. This Omtvedt tried to do, but he also left within a week, because there was no money to pay the laborers.

A new contractor was brought in to complete the house. Oates was compelled to pay the bills as they came in, thus resulting in the total cost to him of $12,112.81, which included the check for $2,565.08. This became necessary because of threats to file liens against the house for work done.

This action, alleging fraud, was commenced against Taylor and wife, and against LeRoy O. Flore and wife. Flore was the general superintendent of all construction for the corporation. The trial court dismissed the action against Flore and wife and rendered judgment against Taylor and the marital community.

█ To constitute "actionable fraud," the representations must have been made as to a material matter, with a knowledge of their falsity. They must have been made with the intention that they should be acted upon by the other party; and he must have acted in reliance upon them to his injury. *Hamilton v. Mihills*, 92 Wash. 675, 159 Pac. 887.

"It is well settled that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation. Where the law imposes a duty on one party to disclose all material facts known to him and not known to the other, silence or concealment in violation of

this duty with intent to deceive will amount to fraud as being a deliberate suppression of the truth and equivalent to the assertion of a falsehood. The concealment of a fact which one is bound to disclose is an indirect representation that such fact does not exist, and constitutes fraud." 37 C. J. S. 244, Fraud, § 16a.

The rule is stated in *Restatement of the Law* under the heading, *Deceit: Business Transactions,* p. 116, § 550:

"One party to a business transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other as though he had stated the nonexistence of the matter which the other was thus prevented from discovering,"
and § 551:

"(1)  One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2)  One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated

"(a)  such matters as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."

■  Ordinarily, the duty to disclose a material fact exists only where there is a fiduciary relationship, and not where the parties are dealing at arm's length. However, in *Perkins v. Marsh,* 179 Wash. 362, 37 P. (2d) 689, where the premises had been leased as a retail automobile business, the basement to be used as a storage and salesroom for used automobiles, we held that failure to reveal that the premises were never fit for the purposes for which they were leased by reason of the fact that the basement was continually wet during the rainy season, presented a case of fraudulent concealment. We there said:

"It is true that, in the absence of a duty to speak, silence as to a material fact does not of itself constitute fraud.

*Farmers State Bank of Newport v. Lamon,* 132 Wash. 369, 231 Pac. 952, 42 A. L. R. 1072. However, the concealment by one party to a transaction of a material fact within his own knowledge, which it is his duty to disclose, is actual fraud. If appellants intentionally concealed some fact known to them which it was material for respondents to know, that constituted a fraudulent concealment; that is, the concealment of a fact which one is bound to disclose is the equivalent of an indirect representation that such fact does not exist, and differs from a direct false statement only in the mode by which it is made."

█ It will thus be seen that the duty to speak does sometimes arise when the parties are dealing at arm's length. That duty arises where the facts are peculiarly within the knowledge of one person and could not be readily obtained by the other; or where, by the lack of business experience of one of the parties, the other takes advantage of the situation by remaining silent. However, a party cannot be permitted to say that he was taken advantage of, if he had means of acquiring the information, or if, because of his business experience or his prior dealings with the other, he should have acquired further information before he acted.

█ Here, there was no fiduciary relationship. The parties were dealing at arm's length. It can be assumed that, had respondent been aware of the precarious financial condition of the corporation, he would not have advanced the money. Did appellant owe respondent the duty to speak? Respondent was an experienced business man. He knew that, under the terms of the contract, he was not obligated to make any payments at that time. He had been put on notice of the business dealings of the corporation, because it had tried to obtain the $2,500 payment before it started the basement. He knew that part, at least, of the advancement was to be used for the purpose of paying general corporation bills. Under the circumstances, it was his duty to investigate further before making an advancement not required under the terms of the contract. But he was interested in getting into the house by June 1st, so he took a chance. Under all of the facts in this particular situation, there was no duty

on the part of appellant to speak, and his silence did not constitute actionable fraud.

The judgment is reversed.

MALLERY, C. J., ROBINSON, and SIMPSON, JJ., concur.

HILL, J., dissents.

---

January 6, 1949.   Petition for rehearing denied.