# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

HARRY and BETTY MAY CORLISS, )
husband and wife; TIMOTHY CORLISS; )
and SCOTT CORLISS, as individuals )
and derivatively on behalf of )
WASHINGTON ROCK QUARRIES, )
)
           Appellants, )
)
    v. )
)
LARRY P. HUGHES and JANE DOE )
HUGHES, husband and wife and their )
marital community; HARRY HART and )
BETH HART, husband and wife and )
their marital community, )
)
          Respondents. )

No. 69432-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: February 18, 2014

SPEARMAN, A.C.J. — The main issue on appeal is whether the trial court properly granted the summary judgment motions of Larry and Jane Doe Hughes and Harry and Beth Hart, thereby dismissing the lawsuit of Harry, Betty, Timothy, and Scott Corliss[1] and Washington Rock Quarries, Inc. (WRQ) under the statute of limitations. Larry Hughes and Harry Hart, together with Harry, Timothy, and Scott Corliss, own WRQ. The lawsuit, alleging claims for usurpation of a corporate opportunity, negligent misrepresentation, and breach of fiduciary duty,

---

[1] Harry and Betty are husband and wife and the parents of Timothy and Scott.

was based primarily on Hughes and Hart's purchase of the King Creek Pit and Kapowsin Quarry, property in which WRQ conducted its mining business, without informing the Corlisses and without offering WRQ the opportunity to purchase the property. The Corlisses contend the trial court erred in ruling as a matter of law that they were put on notice of their claims by (1) Larry Hughes' September 2005 letter to Harry Corliss and (2) information received by John Carrosino, the Corlisses' alleged agent, in 2007. We conclude that (1) Harry Corliss had notice through the September 2005 letter but there is an issue of material fact as to whether he was a director of WRQ or a mere shareholder at the time; (2) there is an issue of material fact regarding whether statements to Carrosino bound the Corlisses; and (3) the Corlisses' claims based on a post-sale amendment to the King Creek lease and the re-permitting of the King Creek Pit were properly dismissed for other reasons. We reverse in part, affirm in part, and remand.

## FACTS

WRQ is in the business of mining and selling sand, gravel, and rock. Until 1993, its stock was owned 50 percent by Harry Hart (Hart) and 50 percent by Edward Duggan. That year, Larry Hughes (Hughes) learned of the opportunity to purchase Duggan's shares and informed his friend Harry Corliss (Harry).[2] Harry indicated his desire to purchase half of Duggan's shares but requested that they be registered primarily in the name of his sons, Timothy (Tim) and Scott (Scott) Corliss. The Corlisses and Hughes purchased Duggan's WRQ stock, and the shares were thereafter owned as follows: Hart – 50 percent; Hughes – 25

---

[2] For clarity, the Corlisses will be referred to by their first names. No disrespect is intended.

2

percent; Tim – 12.25 percent; Scott – 12.25 percent; and Harry – 0.50 percent. The Corlisses own their stock as individuals.

Since 1993, Hart has been WRQ's president and Hughes has been its secretary/treasurer. Scott was WRQ's vice president from 1993 until 2004 or 2007. Hughes, Hart, and Beth Hart have held three of the four seats on the board of directors. Harry was a director from 1993 until sometime in 2004 to 2006, when he was replaced by Scott due to deteriorating health.[3]

WRQ leased the King Creek Pit and the Kapowsin Quarry (collectively, "the pits") from International Paper (IP) until 2005. In 2003, IP notified WRQ that it would be cancelling the leases, leaving WRQ with five years to operate in the pits. Hughes and Hart, without informing the Corlisses, negotiated with IP to buy the pits and, in June 2005, formed Rainier Resources, LLC (RR) for that purpose. RR is owned equally by the Hughes and Hart families. RR purchased the King Creek pit (for $4,000,000) and Kapowsin pit (for $3,000,000), closing the sales on September 22, 2005 and March 30, 2006, respectively. Since the purchases, RR has honored IP's leases with WRQ and has not changed their terms, with the exception of adding a "backhaul" provision to the King Creek lease in September 2005. Hughes and Hart also re-permitted the King Creek pit so that a greater area of the pit could be mined. WRQ paid the re-permitting costs.

On or about August 19, 2005, Scott sent Hughes a letter regarding WRQ. The letterhead stated "Corliss Resources" and the footer of the letter included the

_____

[3] The parties dispute when Harry was replaced by Scott. In the same declaration submitted in opposition to summary judgment, Scott states at one point that he replaced Harry on the board of directors in 2004 and at another point that he replaced Harry in June 2005. The May 3, 2006 meeting minutes for WRQ's annual meeting of stockholders and directors indicate that Scott took Harry's place on the board of directors in May 2006.

address "P.O. Box 487, Sumner, Washington 98390." Clerk's Papers (CP) at 122. On September 2, Hughes responded by letter addressed to "Harry B Corliss, Corliss Resources, P.O. Box 487, Sumner, WA 98390," though its salutation was "Dear Scott."[4] Hughes wrote, "You also should be aware that I have purchased the gravel pit and the rock quarry from International Paper. I will honor the terms of the lease International Paper has with Washington Rock."[5] CP at 116, 150.

In 2007, as part of estate planning for Harry and Betty and to gather information about the Corliss family's investment in WRQ, Scott asked John Carrosino, the president of Corliss Resources, Inc. (CRI, a company owned by Tim, Scott, and Harry), to learn more about WRQ and its value. Carrosino met with Hart on April 5, 2007. After the meeting, Carrosino requested copies of the leases for the pits. Sometime between April 5 and May 8, Hughes told Carrosino that he and Hart had purchased the pits. On May 8, however, Hart gave Carrosino the original leases showing IP as the lessor/landholder. That day, Carrosino emailed Hart, expressing confusion over the inconsistency between the documents showing IP was the owner of the land and Hughes' and Hart's statements in conversation that they owned the pits. He requested Hart's help in clarifying who owned the pits. The next day, Carrosino had a phone conversation with Hart, who did not state the leases were incorrect or that he and Hughes had

_____

[4] It is evident from the substance of the letter that it was written in response to Scott's letter, although both parties' discussion of the letter describes it as written to Harry.

[5] Betty Corliss wrote to Hughes in March 2006, seeking assistance with an unrelated lawsuit. Hughes responded on March 8, 2006 and enclosed a copy of his September 2, 2005 letter. Hughes and Hart do not argue that the letter to Betty was sufficient to trigger the statute of limitations.

4

purchased the pits. Carrosino continued to seek information about ownership. In a June 6 email to Hart, Carrosino wrote,

> The two pieces of material I do not have and would very much like to get from you is the actual purchase of the real estate under the two pits operating at Washington Rock and the related amended or assigned leases with related royalty agreements. I would like to have copies of the documents that support the leases you and Pat have as land owners with Washington Rock as compared to the old leases with the prior owners that are now no longer the land lords [sic].

CP at 43. Hart never gave the requested documents to Carrosino. Concluding that Hughes and Hart did not own the pits, Carrosino did not inform any of the Corlisses of Hughes' and Hart's statements that they had purchased the pits. According to Scott's and Tim's declarations, Scott learned of the purchase of the pits in April 2009 when Hart told him during a meeting that Hughes purchased the pits, and Tim learned of the purchase after that meeting.[6]

On February 8, 2012, the Corlisses, individually and derivatively on behalf of WRQ, brought an action against Hughes and Hart, alleging that they never informed the Corlisses of the negotiations or purchase of the pits or of the re-permitting of the King Creek pit. The complaint alleged claims for usurpation of a corporate opportunity, negligent misrepresentation, and breach of fiduciary duty. Hughes and Hart filed motions for summary judgment based on the three-year statute of limitations under RCW 4.16.090. They argued that the Corlisses had notice of their claims in 2005 from Hughes' letter and in 2007 through Carrosino. The trial court granted both Hughes' and Hart's motions. It denied the Corlisses' motion for reconsideration. The court awarded Hughes and Hart attorney's fees

---

[6] There is no evidence from Harry in the record.

No. 69432-4-I/6

and expenses under RCW 23B.07.400. The Corlisses appeal from the orders granting summary judgment and awarding attorney's fees.

## DISCUSSION

### Statute of Limitations

The Corlisses contend the trial court erred in ruling that their claims were barred by the statute of limitations.[7] We review summary judgment de novo. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). The parties agree that all claims are governed by RCW 4.16.080(4), which states that a three-year statute of limitations applies to "[a]n action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." The statute begins to run when the plaintiff discovers, or by reasonable diligence would have discovered, the cause of action. First Maryland Leasecorp v. Rothstein, 72 Wn. App. 278, 282, 864 P.2d 17 (1993). The question of when the plaintiff discovered or could have discovered such facts is one of fact. Sherbeck v. Estate of Lyman, 15 Wn. App. 866, 869, 552 P.2d 1076 (1976). The party seeking to toll the statute of limitations based on the discovery rule has the burden to show the fraud could not have been discovered until three years before the commencement of the action. Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 518, 728 P.2d 597 (1986).

---

[7] The Corlisses also argue that even if the statute of limitations bars their claims, the trial court should have applied equitable tolling. We do not reach the issue given our disposition of this appeal.

6

## I. September 2005 letter

The Corlisses contend there are multiple questions of fact involving Hughes' 2005 letter, including whether Harry received the letter and whether he was competent enough in 2005 to understand it.[8] But we conclude that this issue is not properly before us. As Hughes notes, these arguments were made for the first time in the Corlisses' motion for reconsideration. These arguments were not closely related to a position asserted previously and depended on new facts; thus, they are not properly before this court.[9] River House Dev. Inc. v. Integrus Architecture, P.S., 167 Wn. App. 221, 231, 272 P.3d 289 (2012) (party bringing motion for reconsideration may preserve issue for appeal that is closely related to position previously asserted and does not depend on new facts). The trial court

---

[8] The Corlisses make several other arguments with respect to Hughes' 2005 letter. They argue that there is no evidence of who lived or worked at the address to which the letter was sent. They are mistaken. The footer of Scott's letter to Hughes set forth the same address to which Hughes sent his letter to Harry. The Corlisses also argue that Hughes and Hart may not rely on the letter to show that notice was given because the statement on which they rely is false. Specifically, they point out, the letter falsely states that Hughes, not RR, purchased the pits. This argument is not well taken. The gist of the Corlisses' lawsuit is that Hughes and Hart usurped a corporate opportunity by purchasing the pits; the opportunity to WRQ was lost when someone other than WRQ bought the pits. The letter gave notice to Harry as to Hughes' purchase of the pits, regardless of whether it was through RR.

[9] We also conclude that even if this issue is properly before this court, the trial court did not abuse its discretion in denying the motion for reconsideration. This court reviews a trial court's decision on a motion for reconsideration for abuse of discretion. Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000). First, Hughes' testimony that he sent the letter was unrebutted, and Scott's testimony showed the letter was received at CRI's office and maintained in its files. Second, the Corlisses' evidence of Harry's incompetence consisted of Scott's testimony that his dad had two bad falls in 2004 and 2005 and that, starting in 2004, Harry gradually "started to let go a little bit." CP at 717. Contractual capacity is strongly presumed; the party alleging incapacity bears the burden of proving incapacity by clear, cogent, and convincing evidence. Page v. Prudential Life Ins. Co. of Am., 12 Wn.2d 101, 109, 120 P.2d 527 (1942). It must be shown that the person had "no reasonable perception or understanding of the nature and terms" of the information. Id. The trial court did not err in ruling that the Corlisses' evidence failed to create a genuine issue of material fact that Harry could not have had a reasonable understanding of the letter in 2005. Moreover, when a new theory is presented to the trial court for the first time in a motion for reconsideration, the trial court may refuse to consider it. Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005).

did not err in ruling on summary judgment that Hughes' letter gave Harry notice of the purchase of the pits in 2005.

## II. Hughes' and Hart's statements to Carrosino

The Corlisses contend there are genuine issues of material fact in dispute regarding whether Carrosino received notice of the purchase of the pits and whether he was an agent for any of the Corlisses. Hughes denies there are any material facts in dispute on these issues. Hart concedes that questions of fact exist whether Carrosino was an agent of any Corliss when he performed his task and whether he acquired notice that Hughes and Hart purchased the pits, but argues that reasonable minds could only conclude that Carrosino acted on behalf of the Corlisses' entire 25 percent interest in WRQ and that Hughes and Hart told him that they purchased the pits.[10] We conclude there is an issue of fact as to whether Hughes' and Hart's representations to Carrosino bound the Corlisses or, stated differently, whether Carrosino's knowledge of their representations should be imputed to the Corlisses.

An agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control. Moss v. Vadman, 77 Wn.2d 396, 402-03, 463 P.2d 159 (1970). For an agent's knowledge to be imputed to a principal, the knowledge must be relevant to the agency and the matters entrusted to the agent. Roderick

---

[10] While both parties agree there are disputed issues of material fact with respect to whether Carrosino was an agent for any of the Corlisses, neither party specifically describes the disputed issues of fact. It appears the parties' arguments are instead about the legal conclusions that can be drawn from the facts.

Timber Co. v. Willapa Harbor Cedar Products, Inc., 29 Wn. App. 311, 316-17, 627 P.2d 1352 (1981).

> The existence of a principal-agent relationship is a question of fact unless the facts are undisputed. The question of control or right of control is also one of fact for the jury. But if the facts are undisputed and, without weighing the credibility of witnesses, there can be but one reasonable conclusion drawn from the facts, the nature of the relationship between the parties becomes a question of law.

O'Brien v. Hafer, 122 Wn. App. 279, 284, 93 P.3d 930 (2004) (quotation marks and citations omitted). The burden of establishing agency is on the party asserting it. Id.

First, we conclude that, as a matter of law, Carrosino was Scott's agent because he acted on Scott's behalf and was subject to Scott's control while he carried out his task. Scott's declaration establishes that, for various reasons (including estate planning), he authorized and directed Carrosino to "gather some information about the financial performance of WRQ and to help determine its value." CP at 459. The Corlisses argue that because Carrosino was employed by CR, he was not Scott's agent. But they cite no authority for the proposition that a person can only be an agent for the entity that pays him. They also argue that there can be no agency because Scott did not control the manner of Carrosino's performance. The argument is not well taken. "The negligence of the agent is imputed to the principal, because he has the right to control the acts of the agent. It is the existence of the right of control, not its exercise, that is decisive." Pagarigan v. Phillips Petroleum Co., 16 Wn. App. 34, 37, 552 P.2d 1065 (1976) (emphasis added) (quoting Poutre v. Saunders, 19 Wn.2d 561, 545, 143 P.2d 554 (1943)). A principal's control over the manner of performance is critical

where the agent harms a third party and the third party asserts a claim against the principal, as in the cases cited by the Corlisses.[11] But this case does not involve the Corlisses' liability vis-à-vis Carrosino.

We also conclude there is no issue of fact that Carrosino was acting on behalf of Harry and Tim. At his deposition, Scott described the purpose of directing Carrosino to look into WRQ as being to assess the Corlisses' investment in WRQ. He testified that the Corliss family wanted to know more about its ownership interest in WRQ and the general business of WRQ. He noted that Hart had expressed interest in buying the family's shares. Carrosino, likewise, stated in his declaration that his task was for the Corliss family's benefit. He stated that he was asked by Scott to look into the Corliss family's investment in WRQ because the family had little information about the operations or financial performance of WRQ. His goal was "to gather information for the Corliss family to determine next steps." CP at 487. Carrosino made similar statements in his deposition, testifying that his primary mission was to "lend a hand to gather information and advise him <u>and his other shareholders</u>" of the value of WRQ. (Emphasis added). CP at 62 He testified that the Corliss family was conducting estate planning for Harry and Betty and that the valuation of WRQ was to be used for that purpose. With this evidence, Hughes and Hart meet their initial burden of showing a lack of an issue of fact that Scott had Harry and Tim's

---

[11] See <u>Barker v. Skagit Speedway, Inc.</u>, 119 Wn. App. 807, 814-15, 82 P.3d 244 (2003) (no agency where plaintiff sought to hold defendant liable for alleged agent's negligence where defendant did not have control over alleged agent); <u>Bloedel Timberlands Dev., Inc. v. Timber Industries, Inc.</u>, 28 Wn. App. 669, 674-75, 626 P.2d 30 (1981) (logging contractor was agent for timber company, such that company was liable for its trespass, if company controlled the manner of contractor's performance by controlling cutting of timber).

authority to direct Carrosino to investigate the Corlisses' interest in WRQ. Where a defendant meets the initial burden of showing the absence of an issue of material fact, the inquiry shifts to the plaintiff; if the plaintiff fails to make a showing sufficient to establish the existence of an essential element in the plaintiff's case, the trial court should grant the motion for summary judgment. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

The Corlisses assert that Scott did not have Tim or Harry's authority to act as an agent. They point to the following statement in Tim's declaration:

> 18. At no time in 2007 to 2008 did I authorize John Carrosino to act as my agent with respect to WRQ or any of my other personal interests or investments.

CP at 464. But this is a conclusory statement of fact. An affidavit in support of or in response to a motion for summary judgment fails to raise a genuine issue of fact where it sets forth ultimate facts, conclusions of fact, conclusory statements of fact, or legal conclusions. Snohomish County v. Rugg, 115 Wn. App. 218, 224, 61 P.3d 1184 (2002). Furthermore, Tim stated that he "never had a role or say in the operation or management of WRQ" and had never been a part of conversations between Hughes, Hart, Scott, or Harry. CP at 463. This shows a lack of effort to maintain his shares independently and supports the inference that the other Corlisses were authorized to deal on his behalf.

The Corlisses also argue that Carrosino was not an agent for any of them because he could not affect their legal relations or those of WRQ. But the ability to affect legal relations is not an essential element to the creation of an agency relationship; it is merely an attribute of an agency relationship once created.

"Consent and control are the essential elements of an agency." Moss v. Vadman, 77 Wn.2d at 403; see also RESTATEMENT (SECOND) OF AGENCY § 1 (1958) ("The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act."). The Corlisses' reliance on Moss to argue otherwise is misplaced. In that case, the court held only that an agency relationship was not created because the alleged agent had no intent to create agency, did not consent to agency, and did not submit himself to the control of the alleged principals. Moss, 77 Wn.2d at 403. The court mentioned an agent's ability to affect legal relations because the facts of the case involved the alleged agent's ability to bind the principal to a real estate purchase and sale agreement. But this case does not involve Carrosino's assertion of legal relations on behalf of the Corlisses.

The Corlisses also cite Zoda v. Eckert, Inc., 36 Wn. App. 292, 674 P.2d 195 (1983), but that case did not state that an alleged agent's power to affect the alleged principal's legal relations was required to create an agency relationship. See id. at 295-96 (agency requires that principal shall have right of control over agent). Moreover, other cases discussing agency have not mentioned any requirement that the alleged agent have the power to affect the alleged principal's legal relations. See, e.g., Deep Water Brewing, LLC v. Fairway Resources Ltd., 152 Wn. App. 229, 268-69, 215 P.3d 990 (2009); Goodman v. Boeing Co., 75 Wn. App. 60, 85-86, 877 P.2d 703 (1994).

12

Next, we conclude there is also no genuine issue of fact that Hughes and Hart's statements to Carrosino put the latter on notice. "The statute begins to run when the fraud should have been discovered, and a clue to the fact which if followed up diligently would lead to discovery is in law equivalent to discovery." Bay City Lumber Co. v. Anderson, 8 Wn.2d 191, 211, 111 P.2d 771 (1941) (quoting Noyes v. Parsons, 104 Wn. 594, 177 P. 651 (1919)). Reasonable minds could not disagree that Hughes and Hart's statements were a clue that they owned the pits. Although Hart failed to give Carrosino the updated leases, the Corlisses do not dispute that Carrosino could have obtained ownership information from third-party sources.[12]

But we conclude there is a genuine issue of material fact as to whether Hughes' and Hart's statements to Carrosino bound any of the Corlisses.

> The principal is not bound by a notification directed towards an agent whose duties or apparent duties have no connection with the subject matter to which the notification relates. It must be given to one who has, or appears to have, authority in connection with it, either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it . . . .

Roderick, 29 Wn. App. at 316-17 (citing RESTATEMENT (SECOND) OF AGENCY § 268, COMMENT C at 585 (1958)). "The reason for this rule is that it would be unreasonable to impute knowledge to an employer from an employee who would not likely pass such knowledge along." Id.

The evidence below showed that Carrosino did not inform the Corlisses of Hughes' and Hart's statements because he believed that the issue of who owned

---

[12] Carrosino did not seek documentation regarding ownership from Hughes, WRQ's attorney, the Pierce County Recorder, the Pierce County Treasurer, the Pierce County Assessor, or the Washington State Department of Natural Resources.

the pits was not necessary to his task of determining the amount of payments due under the leases. Carrosino also did not tell the Corlisses because he concluded that Hughes and Hart did not own the pits, where their statements were inconsistent with the leases they provided to him and they did not send him updated leases showing otherwise. Under these circumstances, we conclude it is not the case that reasonable minds could come to only one conclusion on the issue of whether the scope of Carrosino's agency required him to inform the Corlisses of Hughes and Hart's statements. "[I]n situations where, though evidentiary facts are not in dispute, different inferences may be drawn therefrom as to ultimate facts such as intent, knowledge, good faith, negligence, et cetera, a summary judgment would not be warranted." Preston v. Duncan, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960).

### III. Effect of notice to Harry or Carrosino on Corlisses' claims

The next issue is what effect notice to Harry through the letter and notice to all three Corlisses through Carrosino (if found) would have on whether the Corlisses' claims are barred by the statute of limitations. The Corlisses concede the claim for usurpation of a corporate opportunity is a derivative claim belonging to WRQ,[13] but contend the trial court erred in dismissing all of the claims because each Corliss has independent claims for breach of fiduciary duty and negligent misrepresentation based on Hughes and Hart's concealment of the purchase of

---

[13] See Wagner v. Foote, 128 Wn.2d 408, 413, 908 P.2d 884 (1996) (corporate opportunity doctrine centers on misappropriation of business opportunities belonging to corporation).

the pits.[14] They contend a separate discovery rule analysis must be done for each Corliss for each claim.

In response, Hughes contends all of the Corlisses' claims are derivative, not individual. We agree. "'[A] stockholder may maintain an action in his own right against a third party . . . when the injury to the individual resulted from the violation of some special duty owed to the stockholder <u>but only when that special duty had its origin in circumstances independent of the stockholder's status as a stockholder</u>.'" <u>Sound Infiniti v. Snyder</u>, 145 Wn. App. 333, 352, 186 P.3d 1107 (2008), <u>affirmed on other grounds</u>, 169 Wn.2d 199, 237 P.3d 241 (2010) (quoting <u>Sabey v. Howard Johnson & Co.</u>, 101 Wn. App. 575, 585, 5 P.3d 730 (2000) (emphasis and alterations in original). Therefore, in <u>Sound Infiniti</u>, a minority shareholder could maintain personal damage claims against majority shareholders in their individual capacities only if the claims arose from something other than shareholder status. <u>Id.</u>

The Corlisses cite several cases for the general proposition that shareholders in closely held companies owe one another fiduciary duties.[15] They contend that Hughes and Hart, as directors and officers, owed such duties to them. Likewise, they cite cases for the proposition that Hughes and Hart are

---

[14] They also contend each of them had independent claims based on the backhaul amendment to the King Creek lease and the re-permitting of the King Creek pit, but as we will explain those claims were properly dismissed for other reasons.

[15] The Corlisses cite <u>Lang v. Hougan</u>, 136 Wn. App. 708, 150 P.2d 622 (2007); <u>Arneman v. Arneman</u>, 43 Wn.2d 787, 264 P.2d 256 (1953); and <u>Hay v. Big Bend Land Co.</u>, 32 Wn.2d 887, 204 P.2d 488 (1949).

liable for negligent misrepresentation.[16] But they do not explain or provide authority specifically addressing why they had an individual, as opposed to derivative, right to sue in these circumstances. They do not explain how they were individually harmed or how their claims are based on something other than their status as stockholders. We conclude the Corlisses' claims are all derivative claims on behalf of WRQ.

In a shareholder derivative suit, "both the cause of action and the judgment thereon belong to the corporation." LaHue v. Keystone Inv. Co., 6 Wn. App. 765, 780, 496 P.2d 343 (1972).[17] The stockholders in a derivative suit stand in the shoes of the corporation and are subject to the same defenses against which the corporation is subjected. Id. at 779. Thus, the next question is whether notice to Harry through the letter and/or notice to all three Corlisses through Carrosino (if the latter is found) constituted notice to WRQ of the claims based on the purchase of the pits.

Harry received notice in September 2005 through Hughes' letter. But the parties dispute whether Harry was a director or only a shareholder at that time,

---

[16] The Corlisses cite Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 744 P.2d 1032 (1987); Boonstra v. Stevens-Norton, Inc., 64 Wn.2d 621, 393 P.2d 287 (1964); and Oates v. Taylor, 31 Wn.2d 898, 199 P.2d 924 (1948).

[17] Although direct recovery to shareholders may be allowed under exceptional circumstances, resulting in a "forced distribution of corporate assets to shareholders," a judgment in favor of the individual stockholders is improper where third party rights of higher priority are involved. LaHue, 6 Wn. App. at 780-81. As Hughes points out, the Corlisses make no argument regarding exceptional circumstances.

and the evidence creates an issue of fact as to this issue.[18] If he was a director, his knowledge would be imputed to WRQ. See Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 518, 728 P.2d 597 (1986) (notice to officer and director is notice to corporation). However, if he was merely a shareholder, the issue of notice to WRQ is unclear. The parties do not address under what circumstances a shareholder's knowledge is imputed to a corporation (particularly a closely held corporation with limited shareholders) where the shareholder brings a derivative action. The parties are left to address this issue on remand. If notice to all of the Corlisses in 2007 (through Carrosino) is found on remand, then notice to WRQ is imputed through Scott, whom all parties agree took over as a director for Harry no later than May 2006.

## Other Claims

The Corlisses contend the trial court erroneously dismissed two of their claims for other alleged wrongs because Hughes and Hart presented no evidence that the statute of limitations ran as to those claims.[19] They assert they did not find out about these wrongs until after February 2009.

---

[18] Hughes and Hart contend Scott took over as a director for Harry in May 2006, as shown by meeting minutes. The Corlisses contend Scott took over as a director in June 2005, pointing to Scott's statement in his declaration that he officially took over as a director in June 2005. Scott further stated in his declaration that no meeting took place on June 6, 2005 and suggests the minutes were manufactured by WRQ's attorney (also Hughes' attorney in this suit). He stated that the 2005 annual meeting was not held until May 3, 2006. The meeting minutes for the June 6, 2005 do not bear the signature of Hughes (WRQ's secretary), although the minutes for other years do.

[19] Hughes and Hart do not argue the statute of limitations ran as to these claims.

First, the Corlisses assert a claim based on a post-sale amendment to the King Creek lease.[20] The amendment allowed WRQ to use the King Creek property for the deposit of backhaul material and required WRQ to pay RR the greater of $1.50 per ton or 80 percent of the dump fee or tipping fee collected by WRQ for material hauled from off-site and dumped into the King Creek pit.[21]. The Corlisses contend this amendment created a new source of revenue for RR at WRQ's expense.

Hart argues that WRQ suffered no damage as a matter of law because backhaul is a right, not an obligation, under the amended lease and WRQ's sharing of profits with RR when it elects to backhaul materials does not support a claim. He points out that Scott agreed a backhaul feature is important and desired. The Corlisses do not dispute that a backhaul feature is desirable, and they offer no persuasive argument in reply, only contending that, but for the amendment, all backhaul revenue would have remained with WRQ. But as the parties agree, the previous lease did not permit WRQ to use the King Creek pit to deposit backhaul material. We conclude this claim was properly dismissed.

Second, the Corlisses assert a claim based on Hughes and Hart's re-permitting and expanding the King Creek pit. At the time of RR's purchase of the pits, the King Creek mining permit allowed mining on 68.8 acres of the 580-acre site. The re-permitting expanded that area to five times its size. WRQ paid for the

---

[20] As Hart points out, no mention of this claim or the facts underlying it is mentioned in the complaint. The claim is mentioned for the first time in the Corlisses' opposition to Hughes' motion for summary judgment. Below, however, Hughes and Hart did not argue in their reply brief that the claim was improperly before the trial court.

[21] The amendment was signed by Hughes for RR and Hart for WRQ.

costs for the new permit. The Corlisses contend it was wrongful to have WRQ pay for a permit that would enrich RR when RR can terminate or elect not to renew WRQ's lease at any time.

Hughes and Hart contend this claim was properly dismissed because WRQ was already obligated under the pre-existing lease to pay the costs of permit expansion.[22] Scott testified that WRQ would have had to pay for the cost of expanding the permits even if Hughes and Hart had not purchased the pits. Scott also testified that WRQ did not overpay for the permit expansion and that it "got a great deal." CP at 95. Hughes and Hart also contend that WRQ's expansion of its King Creek permits means more material was available to WRQ for mining than before, and thus more income is available for WRQ. They contend the fact that they, as landlords, may also benefit from the expansion of WRQ's permits does not alone give rise to a cause of action for damages. The Corlisses offer no response to these arguments and we conclude this claim was also properly dismissed.

---

[22] The King Creek lease with WRQ states at Article 10:

> 10. **Statutory Compliance and Permits**. Lessee shall be responsible, at its cost, for securing the necessary Pierce County permits. If an Environmental Impact Statement is required to secure any Pierce County permits, its cost shall be shared equally by Lessor and Lessee. Lessee shall be responsible, at Lessors cost, for securing any DNR or surface mining permits. Lessor's total cost for its obligations pursuant to this paragraph shall not exceed $40,000.00. Any cost reimbursement by Lessor to Lessee for any permit expenses may, at Lessor's option, be through a Royalty credit to Lessee.

CP at 142. The November 2003 amendment to the King Creek lease acknowledges that the lessor's obligation to reimburse lessee for certain costs as set forth in Article 10 has been satisfied. Thus, under the terms of the King Creek lease any further permitting was the responsibility of WRQ.

## Attorney's Fees to Hughes and Hart Below

The Corlisses appeal the trial court's award of attorney's fees to Hughes and Hart. The court awarded fees under RCW 23B.07.400(4), which provides:

> On termination of the [derivative] proceeding, the court may require the plaintiff to pay any defendant's reasonable expenses, including counsel fees, incurred in defending the proceeding if it finds that the proceeding was commenced without reasonable cause.

This court reviews an award of attorney's fees for abuse of discretion. State ex rel. Quick-Ruben v. Verharen, 136 Wn.2d 888, 903, 969 P.2d 64 (1998).

The Corlisses contend the trial court failed to enter findings of fact or conclusions of law and that such failure alone defeats the award of fees, citing Mahler v. Szucs, 135 Wn.2d 398, 957 P.2d 632 (1998).[23] But the court's order indicated that the basis for the award was that there was no genuine issue of material fact that the statute of limitations had run. Likewise, Hart contends on appeal that the Corlisses' action lacked reasonable cause because it was commenced outside of the statute of limitations.

We reverse the award of fees to Hughes and Hart. This court has stated, in a case involving a similar statute, which provided for attorney's fees in a citizen's action that is dismissed and "which the court also finds was brought without reasonable cause," that the purpose of the statute was to prevent frivolous and harassing lawsuits. State ex rel. Evergreen Freedom Foundation v. Washington Educ. Ass'n, 111 Wn. App. 586, 615, 49 P.3d 894 (2002) (citation

---

[23] The Corlisses do not challenge the amount of the fee award, only its basis. Thus, to the extent the trial court did not enter specific findings supporting the amount of the award, such failure does not affect the Corlisses' claim.

omitted).[24] Here, the statute of limitations issue presented debatable issues of fact and law. That the trial court decided these issues in favor of Hughes and Hart was not a proper basis for finding the lawsuit lacked reasonable cause. Hughes and Hart point to no evidence presented below to show that the lawsuit was brought to harass or for an improper purpose.

Attorney's Fees on Appeal

Hughes and Hart request attorney's fees on appeal under RCW 23B.07.400. We deny the request. The Corlisses' appeal is not commenced without reasonable cause.

Reversed in part, affirmed in part, and remanded.

WE CONCUR:

_____ Spearman, A.C.J.

_____    _____

---

[24] The statute in Evergreen Freedom Foundation provided:

> [I]n the case of a citizen's action which is dismissed and which the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorney's fees incurred by the defendant.

Evergreen Freedom Foundation, 111 Wn. App. at 615 n.23 (quoting former RCW 42.17.400(4)(2002)).