The KEY BANK OF TAMPA, Plaintiff,

v.

SAAB–SCANIA OF AMERICA, INC., Defendant.

No. 80–1070–Civ–T–WC.

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 31, 1982.

Stephen F. Hanlon of Levine, Freedman, Hirsch & Levinson, Tampa, Fla., for plaintiff.

Edward O. Savitz and Peter J. Grilli of Allen, Dell, Frank & Trinkle, Tampa, Fla., for defendant.

OPINION

CASTAGNA, District Judge.

This cause came before the Court in a non-jury trial on July 21, 1982.

The Plaintiff, The Key Bank of Tampa, brought this action maintaining that its inability to recover certain sums advanced to the Defendant's authorized dealer, Tampa Motorcar, Inc., in connection with the floor-plan financing of fifteen Saab automobiles was proximately caused by the negligence

of the Defendant, Saab-Scania of America, Inc., in issuing duplicate Manufacturer's Statements of Origin (MSO's) to Tampa Motorcar, Inc.

At the beginning of trial, the Court granted the Defendant's motion for partial summary judgment as to ten Saab automobiles upon which no duplicate MSO's were issued. Trial commenced as to the remaining five automobiles.

On the basis of the testimony presented at trial and review of exhibits, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The Plaintiff, The Key Bank of Tampa, is a state national bank with its principal place of business located in Tampa, Florida.

2. The Defendant, Saab-Scania of America, Inc., is a corporation incorporated under the laws of the State of Connecticut, with its principal place of business in Orange, Connecticut.

3. Tampa Motorcar, Inc., (TMI) was, at all times pertinent to this action, an authorized Saab dealer in Tampa, Florida.

4. In order to be approved for a dealership, a dealer must have a floor plan financier. The Plaintiff was the floor plan financier of record for TMI.

5. During the summer of 1977, the Plaintiff, the Defendant and TMI entered into an agreement providing for floorplan financing by the Plaintiff of automobiles sold to TMI by the Defendant. Under that agreement the Plaintiff authorized the Defendant to draw drafts on the Key Bank against a $100,000.00 credit line. This arrangement enabled TMI to order automobiles from the Defendant under the line of credit. Upon receipt of TMI's order, the Defendant shipped the automobiles to TMI and mailed an invoice, an Importer's and Manufacturer's Statement of Origin and a draft to the Plaintiff. In the normal course of business, TMI would fill out a trust receipt by which TMI acknowledged receipt of the automobile from the Plaintiff and

held the automobile subject to the Plaintiff's security interests. Upon execution of the trust receipt, the Plaintiff would fill out the draft or otherwise remit payment directly to the Defendant.

6. In addition to the above agreement, the Plaintiff and the Defendant entered into a repurchase agreement whereby the Defendant was required to repurchase unsold Saab automobiles upon which the Plaintiff held loan paper.

7. The parties stipulated that the five automobiles which remained the subject of this action, specifically those bearing identification numbers 3714, 4122, 6845, 7637, and 6368, were not shipped to TMI under the terms of the floorplan agreement. Rather, they were shipped under C.O.D. terms. As a result, the automobiles were ordered by TMI directly from the Defendant for delivery directly to TMI. Consequently, the MSO's and invoices for the automobiles did not go to the Plaintiff, but went directly to TMI.

8. In November or December, 1977, without Plaintiff's knowledge, the Defendant issued and delivered duplicate MSO's to TMI, based on TMI's representations to the Defendant that the originals had never been received. Thereafter, the Plaintiff loaned money to TMI in reliance on clearly marked duplicate MSO's. As a result, the five automobiles, which are the subject of this action, were sold out of trust by TMI. No evidence was presented that the Defendant was aware that TMI had actually received the original MSO's for those automobiles at the time it issued the duplicates.

9. No evidence was presented that the Defendant had any indication that the five automobiles which were not floor-plan vehicles, were going to be financed by the Plaintiff. The Court therefore finds that the Defendant had no reason to know that the Plaintiff had loaned money on those automobiles.

10. In spite of the Plaintiff's claim that it considers the issuance of duplicate MSO's to have been a serious matter, no evidence was presented that the Plaintiff made any

inquiry about them although they were clearly marked as duplicates.

11. The invoices transmitted to the Plaintiff and to TMI by the Defendant all bear the following notation:

Title to the above merchandise covered by this invoice does not pass to the purchaser until payment is received by Saab-Scania of America, Inc. Receipt of check or bank draft does not constitute payment. Payment is considered to have been made only upon collection on such check or bank draft.

Frank Pupello, the president of The Key Bank, acknowledged in his testimony that he understood the meaning of the language, and that his understanding was that the Defendant did not pass title to the automobiles until the Defendant received payment. The Court finds that the Plaintiff was aware that any interest it had in the cars was dependent upon the Defendant being paid and that the Plaintiff never checked with the Defendant to see if the Defendant had been paid.

12. The evidence shows that the floorplan verifications conducted by the Plaintiff were not conducted with sufficient care and attention to reveal the sale of the five automobiles out of trust by TMI. Michael Pupello, currently a vice-president of the Key Bank, was in charge of checking the inventory of TMI to make sure that automobiles were not being sold out of trust. Although Pupello testified that he made up a list of the automobiles the Plaintiff had in trust and matched the identification numbers of the automobiles on the floor with those reflected on his list, he did not retain the list after completing and balancing the inventory. Pupello testified that if a certain floorplan automobile was not on the premises, he would not always check up on the missing car. Moreover, Pupello testified that there were times where he may have accepted the word of TMI that a certain automobile was on the floor without Pupello actually seeing the identification number.

13. Frank Pupello, is and was, at all times pertinent to this action, the president of the Key Bank. He was in the construction business until 1974 or 1975, and at the time of the transactions outlined herein, had only approximately three years experience in the banking industry.

14. The evidence clearly shows that the Plaintiff did not use the information it obtained from TMI's principal, Glen Major, in assessing Major's veracity or background. Specifically, in his financial statement, Major denied having ever taken bankruptcy; however, the credit report obtained by the Plaintiff stated that Major had in fact filed for bankruptcy in 1972. Frank Pupello testified that he was unaware of this contradiction, and, therefore, failed to report that information to either the bank's finance committee or board of directors at the time that loans to TMI were being recommended.

### Conclusions of Law

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

2. The contractual relationship between the Plaintiff and the Defendant is limited to the terms of the agreement and the repurchase agreement.

3. The five automobiles which are subject of this action were delivered to TMI by the Defendant on a C.O.D. basis and are, therefore, beyond the scope of the above contractual agreements.

4. Even assuming that the contractual agreements were applicable to the C.O.D. transactions, neither of those agreements created any legal duty on the part of the Defendant to warn the Plaintiff of the existence of a claim by TMI that MSO's were lost or of the fact that the Defendant was going to issue duplicate MSO's, duly marked, to TMI. Moreover, the Court finds no such duty to have arisen from non-contractual sources. See Gulfstar, Inc. v. Advance Mortgage Co., 376 So.2d 243 (3rd DCA 1979).

5. An MSO is not a document of title, Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, 625 F.2d 44 (5th Cir. 1980), and, therefore, any reliance on MSO's by the Plaintiff as evidence of title was misplaced.

6. Even assuming there was a duty from the Defendant to the Plaintiff, the intervening acts of fraud committed by Glen Major "broke any chain of foreseeability that might have arisen from the manufacturers issuance of duplicate documents." *See Gulfstar, Inc. v. Advance Mortgage Co., supra.*

7. The Plaintiff's failure to adequately check the credit of Glen Major and TMI and to adequately supervise the inventory of TMI ultimately resulted in the sale of the five automobiles involved herein out of trust and was the direct and proximate cause the losses suffered by the Plaintiff.

Judgment will be entered in accordance with this Opinion.