IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STEPHEN BRADFORD, on behalf of himself and all others similarly situated, | ) ) ) | No. 40348-3-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| KADLEC REGIONAL MEDICAL CENTER, a Washington Corporation; and Does 1 through 25 inclusive, | ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — Stephen Bradford complains that Kadlec Regional Medical Center (Kadlec) failed to notify him in advance of an emergency room "visitation fee" billed him. This fee represents payment for overhead and operational expenses to maintain a twenty-four-hour-a-day emergency room. The fee is separate from services and treatment provided in the emergency room. Bradford asserts that Kadlec's failure constitutes a breach of duty to disclose information important to a transaction and a violation of the Consumer Protection Act, chapter 19.86 RCW. In addition to denying such a duty, Kadlec asserts that regulations preclude it from disclosing fees. Perhaps

inconsistently, Kadlec also argues it posted the visitation fees in a document called a chargemaster.

While we disagree with Kadlec Regional Medical Center's contention that the federal rules bar it from notifying emergency room patients of potential charges, we agree that regulations impose limits on publicizing fees. The federal Jekyll and Hyde rules seek to promote transparency in fees, while shielding emergency room patients from the worry about the cost of emergency care. We affirm summary judgment dismissal of Stephen Bradford's suit based on the regulations. We particularly adopt the reasoning of a parallel California decision.

## FACTS

We take the facts from declarations filed by the parties in support of and in opposition to summary judgment motions. Stephen Bradford twice visited Richland's Kadlec Regional Medical Center's emergency room.

Shortly after midnight on April 22, 2017, Stephen Bradford arrived in the emergency department of Kadlec Regional Medical Center, complaining of severe abdominal pain. Bradford underwent a computed tomography (CT) scan and other tests, before being released.

On entering the emergency room on April 22, Bradford signed a "General Consent to Treatment and Conditions of Admissions" (Consent and Conditions). The agreement declared in part:

> HOSPITAL CARE AND TREATMENT: *I am presenting myself for emergency services or admission to the hospital and I voluntarily consent to the rendering of such care, including diagnostic tests and medical treatment.* I understand that any examination and treatment that I receive on an emergency basis is not intended as a substitution or replacement for complete medical care.
> . . . .
> CARE PROVIDED: The practice of medicine is not an exact science and guarantees or promises cannot be made as to the result(s) of care, treatment, testing, surgical intervention or other examinations in the hospital.

Clerk's Papers (CP) at 512 (boldface omitted) (emphasis added).

The Consent and Conditions contract rendered Bradford financially responsible for provided emergency "examination and treatment." CP at 512. The document repetitively declared:

> I further understand that the patient is financially responsible for any charges not paid by a third party insurer/payer or other sources.

CP at 514. Stephen Bradford was uninsured. Paragraph 9 of the Consent and Conditions agreement contained an attorney fees clause, which read:

> I acknowledge failure to meet my financial obligations to Kadlec Regional Medical Center may result in the referral of account(s) to professional collection agencies and consent to Kadlec Regional Medical Center or its designees obtaining a copy of my credit report or any other

publicly available data related to my ability to pay. I understand that
Kadlec Regional Medical Center, its affiliates, agents or designees may
contact me using pre-recorded/artificial voice message and/or automatic
dialing services at the telephone number I provided Kadlec Regional
Medical Center. In the event of any dispute regarding payment, I agree to
pay all collection costs, including but not limited to interest, and attorneys'
fees whether or not a case is filed in court.

CP at 514. Stephen Bradford never read the Consent and Conditions contract before
treatment.

Kadlec Regional Medical Center did not mention any emergency room visitation
fee during Stephen Bradford's visit nor did the Consent and Conditions signed by
Bradford disclose any potential of being charged such a fee. The document lacks price
terms for any hospital goods and services. Kadlec does not mention on its website the
existence of the visitation fee to the emergency room. Kadlec posts no fees at the
medical center. Kadlec posted a sign in the emergency room that informed patients of the
availability of a "chargemaster" that listed fees charged for various services. Stephen
Bradford did not read the sign.

On April 28, 2017, Kadlec sent Stephen Bradford a statement requesting payment
of $5,491.57. This bill reflected total charges of $7,845.10, less a discount of 30 percent,
or $2,353.53, because Bradford lacked health insurance. The charges reflected Kadlec's
schedule of standard charges for each procedure and service, commonly known as its
"chargemaster." CP at 122. The bill listed an itemized charge of $1,425.00 for "HC ED

LEVEL 4." CP at 102. "ED" stands for "emergency department." The parties refer to this charge as a "visitation fee." According to Bradford, he encountered shock when he noticed the bill's line item.

In a declaration in support of Kadlec's summary judgment motion, Spencer Harris, its Chief Financial Officer, averred that the visitation fee defrays the substantial costs of staffing, equipping, and operating its emergency department around the clock. Other hospitals call the same charge a visit fee, an evaluation and management fee, an emergency room fee, or an ED Level fee. A hospital bases the visitation fee for a particular visit on the nature and acuity of the patient's ailment.

When billing a patient for treatment, Kadlec Regional Medical Center, like other hospitals, assigns a current procedural terminology (CPT) code for services provided. Emergency room fees are identified by the CPT codes 99281-99285. Spencer Harris testified that the Centers for Medicare & Medicaid Services, the Children's Health Insurance Programs, and the federally facilitated Marketplace employ these codes. Harris believes that every emergency department in the State of Washington uses the codes and charges these fees.

In a declaration, Brad Fisher, attorney for Kadlec Regional Medical Center, appended a page from the Fair Health Consumer website, that identifies the fee of $1,756.00 for an emergency room visit for an ailment of high severity in Richland,

Washington, the location of Kadlec. The CPT code for the service is 99284. We assume that $1,756.00 is Kadlec's chargemaster amount for visitation fee charged Stephen Bradford. Bradford's bill, however, lists the charge at $1,425.00.

On November 15, 2017, Stephen Bradford, at the advice of his physician, again visited the Kadlec Regional Medical Center emergency room. The physician worried that Bradford might be experiencing a heart attack. Bradford returned for additional testing on November 21. As a result of these subsequent visits, Bradford incurred approximately $4,300.00 in additional charges, which Kadlec allowed him to pay under a payment plan covering all his outstanding debt. The charges also included a $1,425.00 emergency room visitation fee.

Stephen Bradford emphasizes the following facts. Kadlec directs all patients visiting the emergency room to sign the Consent and Conditions agreement. Kadlec charges the visitation fee to all patients visiting its emergency room. Kadlec gives none of its emergency room visitors warning that Kadlec will charge a visitation fee in addition to discrete charges for treatment rendered.

Stephen Bradford underscores that Kadlec Regional Medical Center instructs its employees not to discuss charges for emergency room services. Kadlec's employee Andrew Moreno testified, in a deposition, that the federal Emergency Medical Treatment and Active Labor Act prohibits emergency room personnel from discussing with patients

6

the cost of emergency room care.  Moreno quoted Kadlec's scripted response to patient cost inquiries:

> "Your health is the most important thing to us right now.  You will be provided with medical screening examination and stabilizing treatment for an emergency medical condition regardless of your ability to pay.  However, after your examination and emergency treatment, you will be given the opportunity to provide insurance information or make arrangements for the payment of services today."

CP at 169.  Kadlec directs its employees, if a patient asks further, to declare:

> "We understand that you would like to know in advance how much you would be charged for the services we provide to you today; however, we are restricted by law from discussing financial arrangements with you prior to your medical screening condition."

CP at 169 (emphasis omitted).

## PROCEDURE

Stephen Bradford filed this class action suit against Kadlec Regional Medical Center for concealment and billing of a visitation fee to which emergency room patients never agreed.  He contends the Consent and Conditions agreement contained no definite price for services such that the contract should not be enforced.  He seeks recovery under the Consumer Protection Act.  He also seeks a declaratory judgment that Kadlec's visitation fee is unlawful and contrary to the Consent and Conditions contract.

Kadlec removed Stephen Bradford's suit to federal court based on the "Class Action Fairness Act."  The federal court remanded the case to state court under an

7

exception to the act. Kadlec filed a counterclaim for more than $5,000.00, seeking recovery of Stephen Bradford's bill.

The parties brought cross motions for summary judgment. The trial court granted Kadlec's summary judgment motion and dismissed Stephen Bradford's complaint with prejudice. The court never certified a class. The superior court entered judgment in favor of Kadlec for the balance owed by Bradford of $6,364.65. The court also awarded Kadlec $120,778.18 in fees and costs.

LAW AND ARGUMENT

Disclosure of Emergency Room Visitation Fee

On appeal, Stephen Bradford challenges Kadlec Regional Medical Center's assessment of the visitation fee on two grounds. First, Bradford characterizes Kadlec as possessing superior knowledge of the fees it charges to its patients. He argues that, with this exclusive knowledge, Kadlec held a duty in advance to inform him of the visitation fee it would charge him for visiting its emergency room. Second, the Consent and Conditions, an adhesion contract, did not impose any duty on a patient to pay a visitation fee. Bradford adds that Kadlec's violation of these duties breached Washington's Consumer Protection Act. Bradford seeks reversal of the summary judgment order in favor of Kadlec and asks for the grant on summary judgment in his favor. He also challenges the reasonable attorney fees and costs awarded to Kadlec.

8

We suspect that Stephen Bradford violates the Affordable Care Act's individual mandate by failing to maintain health insurance. 26 U.S.C. § 5000A. Since 2017, the law no longer imposes a penalty, however. 26 U.S.C. § 5000A, *amended by* Pub. L. No. 115-97, 131 Stat. 2060 (2017). We do not consider in our decision any violation of the mandate by Bradford.

Stephen Bradford's quest for prominent advance disclosures of billing practices does not tailor fit a hospital's emergency room services. In other settings, such as the banking industry, this court has promoted transparency in charging fees. *Feyen v. Spokane Teachers Credit Union*, 23 Wn. App. 2d 264, 276, 515 P.3d 996 (2022), *review granted and dismissed,* 1 Wn.3d 1024 (2023). But federal law promotes contrary public policies concerning prices of emergency room visits. Some of the statutes and regulations seek to shield the patient from knowledge of charges so as not to discourage the patient from emergency treatment. At the same time, to promote transparency, some statutes and regulations require disclosure of emergency room pricing for the patient. But the patient must know of the availability of the information and engage in an extensive search to gain this information. Even then, the argotic acronyms used when the hospital posts the information prevent an ordinary patient from learning the price.

We conflate Stephen Bradford's two causes of action and address them concurrently. We first quote relevant federal regulations that control a hospital's billing practices. We then discuss equivalent foreign decisions.

We locate the relevant federal regulations and guidelines from our own research, the parties' briefs, and the comprehensive decision in *Capito v. San Jose Healthcare System, LP*, 17 Cal. 5th 273, 561 P.3d 380, 328 Cal. Rptr. 3d 373 (2024). The Centers for Medicare and Medicaid Services (CMS), a division of the United States Department of Health and Human Services, administers the nation's Medicare and Medicaid programs. In this role, CMS issues rules that cover hospitals accepting Medicare and Medicaid patients. Kadlec accepts Medicare and Medicaid patients.

Because emergency medical care provides a vital public service necessary for the protection of the health and safety of all, its provision and pricing have long been subject to extensive state and federal regulation. Under federal law, qualifying hospitals must provide emergency care to any person who comes to the emergency department, including a screening and stabilizing treatment or transfer to a hospital that can provide that treatment. 42 U.S.C. § 1395dd(a)-(b). A federal regulation also prohibits emergency room registration procedures that "may . . . unduly discourage individuals from remaining for further evaluation." 42 C.F.R. § 489.24(d)(4)(iv).

Federal law's extensive scheme obligates hospitals to disclose the prices of medical services, including fees for evaluation and management services, or visitation fees, for emergency room patients. Medicare participating hospitals must publish online or at the hospital a "chargemaster" listing the uniform charges for its services, regardless of payer type. 42 U.S.C. § 300gg-18(e); 45 C.F.R. § 180.50. Every listed service must be labeled with a description, charge, and Current Procedural Terminology (CPT) code. 45 C.F.R. § 180.60(b)(8). CPT codes are standardized five-digit numeric codes established by the American Medical Association. Health care providers use the codes to quickly describe to insurers the services for which the provider is billing. *People ex rel. State Farm Mutual Automobile Ins. Co. v. Rubin*, 72 Cal. App. 5th 753, 764, 287 Cal. Rptr. 3d 744 (2021).

Evaluation and management services provided in the emergency department are assigned five different CPT codes. Medicare Program: Changes to the Hospital Outpatient Prospective Payment System, 72 Fed. Reg. 66,580, 66,790 (Nov. 27, 2007). Each code reflects the activities of physicians and does not fully describe the range and mix of services provided by hospitals during visits of emergency department patients. 72 Fed. Reg. at 66,790. These services must be medically necessary and can include reviewing test results, reviewing medical history, ordering medications, tests, or procedures, referring to and communicating with other health care professionals,

11

documenting clinical information in electronic or other health records, and rendering medical decisions. U.S. CENTERS FOR MEDICARE & MEDICAID SERVICES, EVALUATION AND MANAGEMENT SERVICES GUIDE 15 (Sept. 2024). Each code relates the intensity of hospital resources to the different levels of effort represented by the codes, ranging from straightforward to high level. 72 Fed. Reg. at 66,805.

A hospital's visitation fee reflects the hospital resources expended in operating a fully staffed and equipped emergency room department that continuously operates. Medicare Program; Hospital Outpatient Prospective Payment System, 71 Fed. Reg. 67,960, 68,132 (Nov. 24, 2006). The fee can cover the cost of nursing staff, maintenance of diagnostic and therapeutic technology, building costs, and administrative overhead costs. Under federal law, an emergency room must include space for screening examinations, specialized equipment, full coordination with on-call physicians, lighting, bathrooms, janitorial services, and security. The CMS recognizes the increased cost of operating a twenty-four-hour department. The unending operation provides a crucial safety net in the nation's health care system. 71 Fed. Reg. at 68,132. CMS recognizes the difference between a visitation fee and the individual hospital charges incurred as part of the screening examination and stabilizing services provided to patients, such as x-rays, medications, surgical procedures, and lab work, by labeling these individual charges as "separately payable services, " as opposed to a "visit fee" that covers the bundling of

overall "hospital resources" required to operate a fully staffed and equipped emergency room around the clock. 71 Fed. Reg. at 68,142.

Federal rules embody the importance of, and need for, greater hospital pricing transparency, with the benefits of promoting competition and reducing medical costs. Medicare and Medicaid Programs: CY 2020 Hospital Outpatient PPS Policy Changes, 84 Fed. Reg. 65,524, 65,525-28 (Nov. 27, 2019). Nevertheless, federal laws also seek to ensure prompt emergency medical care for those in need. Hospitals must stabilize patients before discussing costs or ability to pay and the only cost notice required in the emergency room is a sign informing patients of the availability of the hospital's chargemaster. 84 Fed. Reg. at 65,536. This isolated and terse notice requirement desires to discourage patients from weighing costs against the necessity or value of emergency care. 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(a). Although the Centers for Medicare and Medicaid Services issued advisory bulletins with the opposite message, one advisory bulletin to hospitals discusses responding to emergency care cost inquiries from patients:

> With regard to a hospital's handling of patient inquiries regarding the patient's obligation to pay for emergency services, we recommended in the proposed bulletin that such questions be answered by qualified personnel. . . .
> . . . This section does not suggest that a patient is not entitled to full disclosure, only that the hospital should always convey to the patient that screening and stabilization are its priorities regardless of the individual's insurance coverage or ability to pay and that the hospital should discuss, to

13

> the extent possible, the medical risks of leaving without a medical screening exam and/or stabilizing treatment.

OIG/HCFA Special Advisory Bulletin on the Patient Anti-Dumping Statute, 64 Fed. Reg. 61,353, 61,355 (Nov. 10, 1999).

The parties' briefs outline few facts as to the ailment for which Stephen Bradford entered Kadlec Regional Medical Center. Nor are we given any facts as to the treatment received by Bradford at the medical center. We assume because of the code that labels Bradford's visit to the hospital that he suffered a serious ailment.

At least three other courts have traveled this road before us. We discuss three foreign decisions. In *Krobath v. South Nassau Communities Hospital*, 178 A.D.3d 807, 115 N.Y.S.3d 389 (2019), Eric Krobath commenced a class action challenging the billing practices of South Nassau Communities Hospital on behalf of self-pay patients who receive emergency treatment. Krobath asserted causes of action for negligent concealment and violations of New York's Consumer Protection Act. He complained that the hospital negligently failed to disclose material facts to him concerning the hospital's billing practices.

The New York Supreme Court, Appellate Division, reversed summary dismissal of the claim under the Consumer Protection Act. The appellate court, however, affirmed

dismissal of the cause of action for concealment. The hospital lacked a special relationship with its patients regarding billing practices.

Stephen Bradford emphasizes that the New York court, in *Krobath v. South Nassau Communities Hospital*, reversed a dismissal of Eric Krobath's Consumer Protection Act claim. We do not deem this ruling persuasive since the court never extensively analyzed the claim in the context of federal rules covering hospital care and billings.

In *DiCarlo v. St. Mary Hospital*, 530 F.3d 255 (3d Cir. 2008), Justin DiCarlo filed a class action against St. Mary Hospital, an acute care hospital, alleging breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, and violation of the New Jersey Consumer Fraud Act. The federal district court granted the hospital judgment on the pleadings. The Circuit Court of Appeals affirmed.

Justin DiCarlo complained that St. Mary Hospital granted a variety of discounted charges to various payers, including Medicare, Medicaid, and insurance or managed care plans that had negotiated discounts. He entered the hospital after experiencing an increased heart rate. DiCarlo lacked medical insurance and did not qualify for any government or charity program. He signed a consent form that guaranteed payment of all charges and collection costs for services rendered. DiCarlo received an EKG and

underwent blood tests. St. Mary Hospital charged DiCarlo $3,483.00, excluding separately billed physicians' fees. The charges greatly exceeded charges paid by privately insured patients, Medicare or Medicaid patients, or patients eligible for the New Jersey Charity Care Program.

Justin DiCarlo principally contended that St. Mary Hospital's practice of charging uninsured patients significantly higher rates than insured patients and patients covered under Medicare and Medicaid discriminates against the uninsured. Stephen Bradford does not assert this argument. Still, the federal appellate court ruled that a hospital lacks a fiduciary duty to patients in the context of billing practices. The court commented it could not discern what constituted a "reasonable charge" for hospital services without wading into the entire structure of hospital care and ensuring hospital solvency. The court remained sympathetic to the burdens on uninsured patients who need medical care and recognized the severe economic hardships that the lack of insurance imposed on them.

The decision most helpful in resolving Stephen Bradford's appeal is the California Supreme Court's one-year-old thorough opinion in *Capito v. San Jose Healthcare System, LP*, 17 Cal. 5th 273, 561 P.3d 380, 328 Cal. Rptr. 3d 373 (2024). Taylor Capito contended that her hospital possessed a duty, beyond the federal regulatory scheme, to notify emergency room patients in advance of evaluation and management services

(EMS) fees by posted signage in the emergency room, on its website, and/or during the patient registration process. The hospital had charged Capito for two visits to the hospital's emergency room. Capito signed an agreement to pay her account at the rates stated in the hospital's price list found in the chargemaster. Before discounts, the hospital billed Capito $41,016.00 for the visits. Each bill included a "'Level 4' Evaluation and Management Services Fee" of $3,780.00. The hospital indicated that the EMS fee covered emergency room overhead expenses of operating an emergency room not billed individually. After applying adjustments and discounts, the hospital reduced her bills to $8,855.38. According to Capito, had she been warned about the EMS fee, she would have left the hospital and sought less expensive treatment elsewhere.

Taylor Capito alleged the hospital's failure to provide advance notice on its website, by signage in the emergency room, or by conversation with the patient violated California's unfair competition law. Both the trial court and the Court of Appeal rejected Capito's claims. The California Supreme Court affirmed.

In *Capito v. San Jose Healthcare System*, the California Supreme Court reviewed both its state and the federal government's extensive rules controlling operations of hospitals. The court reasoned that requiring disclosure of fees as proposed by Taylor Capito would alter the careful balance of competing interests, including price

transparency and provision of emergency care without regard to cost, reflected in the

multifaceted scheme developed by state and federal authorities.

The California Supreme Court noted that federal law demanded hospitals to render

publicly available a chargemaster, a uniform schedule of charges represented by the

hospital as its gross billed charge for a given service or item, regardless of payer type.

42 U.S.C. § 300gg-18(e); 45 C.F.R. § 180.50. In her complaint, Taylor Capito agreed

that the hospital listed an EMS fee as a line item in the hospital's published chargemaster,

but she alleged that the hospital gave no notification or warning that it charged a separate

EMS fee for an emergency room visit. The chargemaster misled the ordinary patient. As

a result, she and other emergency room patients encountered surprise by a substantial

charge added to their bill that they were not expecting and did not agree to pay. The

hospital did not mention the charge in its agreement with the patient.

All three levels of the California courts concluded that a hospital possesses no

duty to disclose EMS fees to emergency room patients beyond that required by the

relevant statutory and regulatory framework. Instead, courts should defer to the

legislative and regulatory determinations of what constitutes requisite notice of the costs

of emergency medical services. Taylor Capito could not sustain a claim under

California's Consumer Protection Act because the form of pricing notice demanded by

Capito exceeded and displaced the legislative and regulatory requirements. The state and

federal legislatures had struck a balance between price transparency and dissuading patients from avoiding potentially life-saving care due to cost.

Taylor Capito claimed that her hospital's nondisclosure of the EMS fee to emergency room patients contravened the public policy in favor of price transparency. The California Supreme Court recognized the concern for transparency in healthcare. But price transparency is not the end all. State and federal laws also seek to ensure that emergency medical care is promptly provided to those in need. The California court worried that the disclosures demanded by Capito would discourage patients from seeking emergency care or place patients in the position of evaluating for themselves whether emergency services, at a particular cost, are warranted in a given circumstance. Capito's emphasis on patient choice presumed that emergency room patients can accurately diagnose whether their ailment is minor and whether they can safely transport themselves or be transported to a lower acuity facility. The regulatory scheme discouraged patients from weighing cost against the necessity or value of emergency care. 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(a).

Despite promoting the need for transparency, the California Supreme Court downplayed the ability of a hospital to be translucent. The court doubted that a posting of five possible EMS fees—running from $672.00 to $5,635.00 depending on the severity of the patient's condition—would provide reliable notice of actual costs. The numerous

discounts available to patients to the chargemaster prices compounded the fickleness of

the accuracy of the chargemaster list. Virtually no patient paid the full amount of the

EMS fee.

Taylor Capito also raised an argument asserted by Stephen Bradford. Because the

hospital possessed exclusive knowledge of the emergency room fee, the hospital

possessed a duty to disclose. Capito cited to cases decided under the California statute

that prohibited unfair and deceptive business practices. CAL. CIV. CODE § 1760. Capito

complained that the tens of thousands of individual billable items listed in the

chargemaster hid the EMS fee and provided no effective notice that such a fee would be

charged. The court rejected these arguments for the same reasons earlier discussed.

Congress and the state legislature had already commandeered the subject matter of notice

requirements for emergency room charges.

Stephen Bradford correctly notes that the federal appeals court, in *Henley v. Biloxi*

*H.M.A., LLC*, 48 F.4th 350 (5th Cir. 2022), ruled that, under Mississippi law, the hospital

held an obligation to disclose a facility surcharge billed to emergency care patients in

advance of receiving emergency treatment or services that would trigger such charge.

We deem *Capito v. San Jose Healthcare System* better reasoned.

Stephen Bradford impliedly concedes that Kadlec Medical Center's chargemaster

included charges for levels of emergency room care. He complains, nonetheless, that

Kadlec hid the nature of its emergency room visitation fee in its billing description:

"HC ED LEVEL 4," a description meaningless to a patient. Of course, Kadlec sent this

billing description to Bradford after the rendering of the services such that it did not

impact whether Bradford received treatment from Kadlec. Stephen Bradford advances a

better argument that nothing in the Consent and Conditions agreement signed by him

remotely mentioned a visitation fee for the overhead and operation costs of an emergency

room. Also, if he had, in advance of his treatment, reviewed the chargemaster, he could

not have discerned his potential charge. Still, the law as stated defeats these arguments.

When arguing that Kadlec Regional Medical Center possessed a duty to disclose

in advance its emergency room fees, Stephen Bradford relies on *Colonial Imports, Inc. v.*

*Carlton Northwest, Inc.*, 121 Wn.2d 726, 853 P.2d 913 (1993) and *Restatement (Second)*

*of Torts* § 551(2)(e) (A.L.I. 1977). Both recognize a duty of a party to a business

transaction, who possesses superior knowledge, to disclose information to the other party.

We consider the federal hospital regulations to usurp this legal principle.

Stephen Bradford contends that the Consent and Conditions agreement language

imposed no obligation on the patient to pay a visitation fee. We disagree. In so arguing,

Bradford highlights language that read:

> I am presenting myself for emergency services or admission to the
> hospital and I voluntarily consent to the rendering of such care, including
> diagnostic tests and medical treatment. I understand that any examination

21

and treatment that I receive on an emergency basis is not intended as a
substitution or replacement for complete medical care.

CP at 512. Bradford suggests that he need only pay for "examination," "tests and

treatment" and a visitation fee does not constitute an examination, test, or treatment. But,

under the language, Bradford consented to care in the emergency room. Such care

included, but was not limited to, diagnostic tests and medical treatment. A later provision

in the agreement rendered Bradford responsible for any charges not paid by another

source.

*Pitell v. King County Public Hospital District No. 2*, 4 Wn. App. 2d 764, 423 P.3d

900 (2018), meets Stephen Bradford's contentions about an indefinite contract and no

obligation to pay a visitation fee under the agreement. Stephen Pitell sought emergency

medical care at EvergreenHealth. He signed a "consent to care" form in which he agreed

to pay the balance due on his account. But instead of paying, he filed a lawsuit against

EvergreenHealth, claiming that the consent-to-care agreement lacked a definite price

term and was therefore unenforceable. He also sued for concealment and sought class

certification. This court held that EvergreenHealth's standard list of charges, its

chargemaster, supplied the price term. Thus, the consent-to-care agreement was

enforceable. We affirmed summary judgment dismissing Pitell's suit and awarding

EvergreenHealth judgment for the bill plus costs and fees. This court followed the

almost American uniform rule that a contract's reference to a hospital's rates or charges is sufficiently definite to refer to a chargemaster list for the price term. The rule recognizes the uniqueness of the market for health care services delivered by hospitals.

Many other cases have held agreements to pay charges of a hospital to be definite when considering the hospital's chargemaster list of fees. *Limberg v. Sanford Medical Center Fargo*, 2016 ND 140, 881 N.W.2d 658; *Holland v. Trinity Health Care Corp.*, 287 Mich. App. 524, 791 N.W.2d 724 (2010); *Banner Health v. Medical Savings Insurance Co.*, 216 Ariz. 146, 163 P.3d 1096, 1101 (Ct. App. 2007); *Nygaard v. Sioux Valley Hospitals & Health Systems*, 2007 SD 34, 731 N.W.2d 184; *Morrell v. Wellstar Health Systems, Inc.*, 280 Ga. App. 1, 633 S.E.2d 68 (2006); *Shelton v. Duke University Health Systems, Inc.*, 179 N.C. App. 120, 633 S.E.2d 113 (2006). In *Burton v. William Beaumont Hospital*, 373 F. Supp. 2d 707 (E.D. Mich. 2005), the patient agreement, like Kadlec's Consent and Conditions agreement, obligated the patient to pay all charges not covered by insurance.

Stephen Bradford faults Kadlec Regional Medical Center for arguing that an emergency room patient acquires an absolute and unconditional liability for every charge billed by Kadlec without regard to the legitimacy or correctness of the charge. Kadlec's brief does not confirm such an argument. We assume that Kadlec agrees that its charges

must be reasonable. Although Bradford challenges the right of Kadlec to charge a

visitation fee, he presents no testimony challenging the reasonableness of the charge.

Attorney Fees at Superior Court

The superior court granted Kadlec Regional Medical Center an award of

reasonable attorney fees and costs as afforded under the Consent and Conditions

agreement. On appeal, Stephen Bradford argues that the contract did not afford Kadlec a

grant of reasonable attorney fees and costs because the contract fee provision only

covered collection actions and because Kadlec's law firm did not qualify as a collection

agency.

Paragraph 9 of the Consent and Conditions agreement mentions referral of a

patient's bill to a professional collection agency. But it does not limit recovery of

collection costs to fees owed by Kadlec to a collection agency. Instead, the paragraph

declared: "In the event of any dispute regarding payment, I agree to pay all collection

costs, including but not limited to interest, and attorneys' fees whether or not a case is

filed in court." CP at 514. Kadlec filed a counterclaim to collect the amount owed. It

prevailed on the counterclaim. To prevail on its counterclaim, Kadlec needed to defeat

Stephen Bradford's claim that the contract was not enforceable and Bradford's request

for declaratory relief that he did not owe the visitation fee.

Under Washington law, for purposes of a contractual attorney fees provision, an action lies on a contract if the action arose out of the contract and if the contract is central to the dispute. *Seattle-First National Bank v. Washington Insurance Guaranty Association*, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991). Bradford's arguments arise from the Consent and Conditions agreement's alleged failure to disclose in advance the existence of and the amount of the visitation fee.

Stephen Bradford may also challenge the reasonableness of the fees granted by the superior court but he does not mount a serious contest. Bradford argues that the rate charged for the services by Kadlec's attorney should not exceed $300.00 per hour. But Bradford provides no testimony as to a reasonable fee for the nature of the legal work in the Benton County community. Bradford complains that Kadlec's counsel recovered fees for work performed on claims other than the contract claim. Nevertheless, counsel reduced from his fee request work performed on erroneously removing the suit to federal court and tasks performed on the Consumer Protection Act claim.

As a court wishing to reduce the cost of litigation, we flinch at the incurring of fees in the sum of $120,778.18 in a case with a sum of $6,364.65 in issue. Nevertheless, Bradford has aggressively litigated the case before the superior court and this court. The parties engaged in extensive discovery. Bradford, in fact, describes his lawsuit as

No. 40348-3-III
*Bradford v. Kadlec*

"intense litigation." Br. of Pet'r at 37. Bradford raised numerous arguments in support

of his position. Kadlec faced a potential class action.

Attorney Fees on Appeal

Kadlec Regional Medical Center requests an award of reasonable attorney fees

and costs incurred on appeal. We grant the request pursuant to the parties' contract,

RCW 4.84.330, and RAP 18.1.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.P.T.[1]

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.

---

[1] George Fearing, a retired judge of the Washington Court of Appeals, is serving
as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

26